**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| ADELINE PATTISON, DOMINIQUE DURSO, JEAN CHARTER, LIANE TUOMALA, MICHELLE GRENON, TERESA HALE, ZESHAAN AHMED, and MYSCHELLE TAYLOR, *individually on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>TELADOC HEALTH, INC.,<br><br>Teladoc. | Case No. 7:23-cv-11305<br><br>Judge Roman<br><br>**JURY TRIAL DEMANDED** |

# **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Adeline Pattison, Dominique Durso, Jean Charter, Liane Tuomala, Michelle Grenon, Teresa Hale, Zeshaan Ahmed, and Myschelle Taylor ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby allege the following against Teladoc Health, Inc. ("Defendant" or "Teladoc"). Facts pertaining to Plaintiffs and their experiences and circumstances are alleged based upon personal knowledge, and all other facts alleged herein are based upon due investigation of counsel and—where indicated—upon information and good faith belief.

## **INTRODUCTION**

1. Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can

have serious consequences including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[1]

2. Simply put, if people do not trust that their sensitive private medical information will be kept private and secure, they may be less likely to seek medical treatment which can lead to more serious health consequences down the road. Because of this, protecting the confidentiality of medical information and preventing its unauthorized disclosure is vital to maintaining public trust in the healthcare system as a whole.

3. The need for data privacy, security and transparency is particularly acute when it comes to the rapidly expanding world of digital telehealth providers; of all the information the average internet user shares with technology companies, health data is some of the most extensive, valuable and controversial.[2]

4. Teladoc is a telehealth company that connects users to doctors, therapists, specialists and dietitians by phone, video or mobile application ("app").[3] In addition to providing primary care for routine checkups, ongoing wellness needs and referrals as well as general non-

---

[1] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022), https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized.") (last visited June 30, 2024).

[2] Protected and highly sensitive medical information collected by telehealth companies includes many categories from intimate details of an individual's conditions, symptoms, diagnoses and treatments to personally identifying information to unique codes which can identify and connect individuals to the collecting entity. *See* Molly Osberg & Dhruv Mehrotral, *The Spooky, Loosely Regulated World of Online Therapy*, JEZEBEL (Feb. 19, 2020) https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137 (last visited June 30, 2024).

[3] *See* https://www.teladoc.com/how-it-works/ (last visited June 30, 2024).

emergency medical care, Teladoc provides mental health support through therapy and psychiatry, specialists for dermatology and expert medical opinions and specialized wellness care including nutrition, tobacco cessation, back and joint care and sexual health.[4]

5. In order to market, sell and provide these services, Teladoc owns, controls and maintains the website https://my.teladoc.com/ (the "Website"), which requires individuals to share highly sensitive personally-identifiable-information ("PII") and protected health information ("PHI", collectively "Private Information")[5] in order to look up providers, review treatments for specific medical conditions, create accounts, participate in highly sensitive and personal health screenings and receive treatments.[6]

6. In order to acquire the highly valuable Private Information of its users, customers and patients (the "Users") for a number of reasons (detailed below), Teladoc installed "pixels" and other secret tracking technologies on its Website.

7. Invisible to the naked eye, pixels—which are configured by the website owner, here, Teladoc—collect and transmit information from Users' browsers to unauthorized third

---

[4] *See* https://www.teladoc.com/ways-we-help/#services-area (last visited June 14, 2024).

[5] Teladoc collects and makes use of individually identifiable health information ("IIHI"). IIHI is comprised of the same types of information as PHI. The usage of the terms changes based on the entity that receives the information. Because the terms are interchangeable and Plaintiffs submitted their health information for purposes of receiving medical services, Plaintiffs use the term PHI throughout for consistency.

[6] Teladoc gives registered Users an option to access their account via its Website, at member.teladoc.com. Teladoc also owns, controls and maintains an app whereby registered Users can, among other things, communicate with a doctor, request a visit, receive reminders for appointments, upload pictures related to a medical visit, and select a pharmacy to send prescriptions. *See* https://player.vimeo.com/video/346011376 (video describing how the app works) (last visited June 14, 2024).

parties including, but not limited to, Meta Platforms, Inc. d/b/a Facebook and Google, Inc. (collectively, the "Pixel Information Recipients").[7]

8. A pixel is a piece of code that "tracks the people and [the] type of actions they take"[8] as they interact with a website including how long a person spends on a particular web page, which buttons the person clicks, which pages they view and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box), among many other things.

9. Many third-party platforms provide tracking technologies that entities can use to acquire and divulge the Private Information of Users. For instance, the Meta Pixel covertly operates by transmitting Users' website interactions and online activities to Facebook (the "Meta Pixel" or "Facebook Pixel").

10. While the information collected and disclosed without permission may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, not just the name of a physician and field of medicine but also the User's first name, last name, email address, phone number, zip code and city of residence entered on the Website.

---

[7] *See* Colin Lecher & Ross Teixeira, *Facebook Watches Teens Online As They Prep For College*, THE MARKUP (Nov. 22, 2023), https://themarkup.org/pixel-hunt/2023/11/22/facebook-watches-teens-online-as-they-prep-for-college#:~:text=After%20signing%20into%20their%20ACT,re%20registering%20for%20the%20ACT (stating that "[b]usinesses embed the pixel on their own websites voluntarily, to gather enough information on their customers so they can advertise to them later on Meta's social platforms") (last visited June 14, 2024).

[8] *Retargeting*, https://www.facebook.com/business/goals/retargeting (last visited June 14, 2024).

11. The process of adding the Pixel to webpages is a multi-step process that must be undertaken *by the website owner*.[9] The Meta Pixel operates by having a small snippet of code placed on webpages by the website owner.[10]

12. Aside from the various steps to create and activate the Pixel, website owners must also agree to Facebook's Business Tools Terms by which Facebook requires website owners using the Meta Pixel to "represent and warrant" that they have adequately and prominently notified users about the collection, sharing and usage of data through Facebook's Business Tools (including the Pixel and Facebook Conversions Application Programming Interface ("Conversions API"))[11] and that websites "will not share Business Tool Data . . . that [websites] know or reasonably should know . . . includes health, financial information or other categories of sensitive information . . . ."[12]

---

[9] *Business Help Center: How to set up and install a Meta Pixel*, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Jun. 14, 2024); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel (in 2022)*, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited Jun. 14, 2024).

[10] While the Meta Pixel as well as other trackers may be small (and, in fact, invisible pieces of code), the data they collect and transmit is extremely extensive. *See Meta for Developers: Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/ (last visited Jun. 14, 2024).

[11] *Meta Business Tools Terms*, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfbOvnb7E0sZ-wzgCW6xNLFKEOEVH_fr6JjkMINTJNqN7i1R-3MPh5caFgmdgAOxbL8&_rdr (last visited Jun. 14, 2024) ("When you use any of the Meta Business Tools to send us or otherwise enable the collection of Business Tool Data . . . , these Business Tools Terms govern the use of that data").

[12] *Id.*; *see also* Pratyush Deep Kotoky, *Facebook collects personal data on abortion seekers: Report*, NEWS BYTE (June 16, 2022) https://www.newsbytesapp.com/news/science/facebook-collects-personal-data-on-abortion-seekers/story (quoting Facebook spokesman Dale Hogan as saying that it is "against [Facebook's] policies for websites and apps to send sensitive health data about people through [its] Business Tools") (last visited Jun. 14, 2024).

13. Here, despite the fact that Teladoc unquestionably used the Meta Pixel to acquire its Users' Private Information, it did ***not*** notify those Users about the surreptitious collection of their sensitive data.

14. Once the webpage is loaded onto a User's web browser, the Pixel uses the snippet of code to connect to Facebook servers that contain the bulk of the Pixel's actual programming.

15. Once fully loaded and operational, the Pixel prompts Users' web browser to transmit specific information based on parameters set by the website owner. This customizable nature of the Meta Pixel allows the website owner to determine which webpages contain the Pixel, which events are tracked and shared with Facebook and whether these events are classified as standard or custom events.

16. Consequently, by implementing the Meta Pixel on its Website, Teladoc introduced a tracker onto the web browsers of its Users enabling real-time disclosure of their communications to Facebook as they are transmitted to Teladoc.

17. While this Complaint primarily focuses on how Teladoc embedded the Meta Pixel on its Website to collect and disclose Users' Private Information, other secret tracking technologies embedded by Teladoc—such as Google and LinkedIn Ads, New Relic and Bing tracking codes—also collect such Private Information, and the respective tech companies have the capability to link it to specific user profiles they have built.

18. For example, Google stores Users' logged-in identifiers on a non-Google website in its logs. Whenever a User logs-in on non-Google websites—whether in private browsing mode or non-private browsing mode—the same identifier is associated with the data Google collects from the User's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses this data to serve personalized ads, among other things.

19. Upon information and good faith belief, Teladoc also installed and implemented Conversions API on its servers.

20. Conversions API serves the same purpose as Pixels in that it collects and transmits Private Information to, for example, Facebook. Unlike the Pixels, however, Conversions API functions from Teladoc's servers and therefore cannot be stymied by the use of anti-pixel software or other workarounds.[13]

21. Through the use of these pixels, cookies and other tracking technologies, Teladoc's Website surreptitiously collects Users' Private Information and automatically sends it to the servers of the corresponding Pixel Information Recipients. This collection and disclosure occurs on every webpage in which Teladoc installed pixels and/or for which it enabled Conversions API.

22. Once Users' Private Information is collected and transmitted to, for example Facebook, it is combined with a User's Facebook profile and all the information about this person is accessible via the User's unique Facebook ID.

23. Facebook tracks and collects data even on people who do not have a Facebook account or have deactivated their Facebook accounts. Those individuals can find themselves in an even worse situation because even though their Private Information is sent to Facebook—without their consent—they cannot clear past activity or disconnect the collection of future activity since they do not possess an account (or an active account).[14]

---

[13] While there is no way to confirm with certainty that a web host like Teladoc has implemented Conversions API without access to the host server, companies like Facebook instruct web hosts to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Teladoc "to share website events [with Facebook] that the pixel may lose." *See Best Practices for Conversions API,* https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited Jun. 14, 2024).

[14] In the past, these were referenced as "ghost accounts" or "shadow profiles." *See* Laura Hautula,

24. Then, completely unencumbered by any pretense of restriction or regulation, the Pixel Information Recipients, in turn, use that Private Information for various business purposes, including using such information to "improve" advertisers' ability to target specific demographics and selling such information to third-party marketers who target those Users online (through their Facebook, Instagram, Gmail and other social media and personal accounts):

> Along with encouraging businesses to spend ad dollars, Facebook also receives the transmitted data, and can use it to hone its algorithms. Facebook can also use data from the pixel to link website visitors to their Facebook accounts, meaning businesses can reach the exact people who visited their sites. The pixel collects data regardless of whether the visitor has an account.[15]

25. Healthcare patients simply do not anticipate that their trusted healthcare provider will send Private Information collected via its web pages to undisclosed third parties—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without their informed and express consent.[16]

26. The Private Information that Teladoc surreptitiously collected from Users' (via pixels, Conversions API and other third-party tracking codes) included the Private Information that Users submitted to its Website including, for example, particular health conditions, types of

---

*Shadow profiles: Facebook has information you didn't hand over*, CNET (April 11, 2018), https://www.cnet.com/news/privacy/shadow-profiles-facebook-has-information-you-didnt-hand-over/ (last visited Jun. 14, 2024).

[15] *See* Lecher & Teixeira, *supra*, note 7.

[16] This Court will not have to look far to find evidence of Meta's violations of privacy laws. In May of this year, for example, the European Union fined Meta "a record-breaking" $1.3 billion for violating EU privacy laws. *See* Hanna Ziady, *Meta slapped with record $1.3 billion EU fine over data privacy*, CNN (May 22, 2023), https://www.cnn.com/2023/05/22/tech/meta-facebook-data-privacy-eu-fine/index.html (last visited Jun. 14, 2024).

health treatments sought and/or received, names, ages as well as other confidential and sensitive Private Information.

27. That is, although Teladoc's patients understandably had a reasonable expectation of privacy as they used the Website, those Users were unknowingly providing their Private Information to Teladoc as they (i) navigated the Website, (ii) created patient accounts, (iii) completed health assessments and questionnaires including their medical histories, (iv) researched doctors and other health-related services providers, (v) reviewed conditions and available treatments and (vi) made and managed appointments.

28. Notably, Teladoc begins tracking patients from the moment they land on Teladoc's Website via the Meta Pixel. The Pixel is configured to capture a number of "events" as the User browses the Website including, but not limited to, searches for specific medical conditions and symptoms, registers as a patient, provides Private Information and/or views and selects available providers and treatments.

29. Plaintiffs and Class Members who visited and used Teladoc's Website thought they were communicating *only* with their trusted healthcare providers. But by employing third-party trackers—which obtain detailed information about its Users' medical information (including highly sensitive categories such as mental health)—Teladoc effectively traded the private medical information of its patients for detailed analytics of its Users to increase its revenues and profits.

30. To make matters worse, Teladoc has ***not*** informed those Users of the unauthorized disclosure of their Private Information, as many other healthcare and telehealth entitles who have utilized similar tracking technology to collect and disclose Private Information to third parties have done.[17]

[17] In stark contrast to Teladoc, in the last year, several medical providers that installed the Meta

31. Despite numerous warnings from federal regulators (not to mention several FTC enforcement actions against telehealth companies for similar conduct) about the data privacy risks of using third-party tracking technologies,[18] Teladoc designed and maintained its Website so that Users would be required to submit Private Information in order to participate in health assessments and other health-related services, review treatments offered by Teladoc for their medical conditions, purchase treatment options and create accounts, among many other things.

32. The reason Teladoc goes to these lengths to obtain this sensitive Private Information is, quite simply, because its Users would ***not*** provide it if they were informed and given a choice. That is, if Teladoc told its patients that by using its Website their sensitive Private Information would be collected and disseminated to Facebook and/or other third-party platforms, Users would deny consent and/or demand significant compensation for the use of their private and valuable health information in this manner.

33. As detailed herein, Teladoc owed common law, contractual, statutory and regulatory duties to keep Users' Private Information safe, secure and confidential. Furthermore,

---

Pixel on their Web Properties have provided their patients with notices of data breaches caused by the Pixel transmitting PHI to third parties. *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf; Annie Burky, *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies,* FIERCE HEALTHCARE (October 20, 2022), https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health Notifies Patients of Potential Data Privacy Incident*, PR NEWSWIRE (August 19, 2022), https://www.prnewswire.com/news-releases/novant-health-notifies-patients-of-potential-data-privacy-incident-301609387.html.

[18] *See, e.g.*, Heather Landi, *Regulators Warn Hospitals and Telehealth Companies about privacy risks of Meta, Google Tracking Tech*, FIERCE HEALTHCARE (July 21, 2023), https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google (last visited Jun. 14, 2024) (noting that the FTC and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 hospital systems and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps).

by obtaining, collecting, using and deriving a benefit from their Private Information, Teladoc assumed legal and equitable duties to Users to protect and safeguard their Private Information from unauthorized disclosure.

34. Teladoc, however, failed in its obligations and promises by utilizing Pixels, Conversions API and/or other tracking codes to collect and divulge Users' Private Information with the Pixel Information Recipients.[19]

35. As a result, Plaintiffs and Class Members (the Users) have suffered numerous compensable injuries including (i) invasion of privacy, (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the transmissions of their Private Information to the Pixel Information Recipients, (iii) loss of the benefit of the bargain, (iv) diminution of value of the disclosed Private Information, (v) statutory damages and (vi) the continued and ongoing risk to their Private Information.

36. Plaintiffs seek to remedy these harms and therefore bring this class action lawsuit on behalf of all similarly situated individuals whose Private Information was disclosed to the Pixel Information Recipients through Teladoc's unauthorized use of pixels, Conversions API and/or other similar tracking technologies. Accordingly, Plaintiffs assert individual and representative claims for: (i) Violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.*; (ii) Negligence; (iii) Unjust Enrichment; (iv) Breach of Implied Contract;

---

[19] Teladoc breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web-based technology to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share patients' Private Information; (iii) failing to obtain the consent of patients, including Plaintiffs and Class Members, to disclose their Private Information to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiffs' and Class Members' Private Information through the Pixels and Conversions API; (v) failing to warn Plaintiffs and Class Members of such sharing and disclosures and (vi) otherwise failing to design and monitor the Website to maintain the confidentiality and integrity of patients' Private Information.

(v) Breach of Confidence; (vi) Bailment; (vii) Violation of New York's Deceptive Trade Practices Act, New York Gen. Bus. Law § 349; (viii) Violation of the Florida Security of Communications Act ("FSCA"), Fla. Stat. 934.01, *et seq*.; (ix) Violation of California Invasion of Privacy Act, Cal. Penal Code § 630, *et seq.*; (x) Violation of California Confidentiality of Medical Information Act, Cal. Penal Code § 56, *et seq.*; (xi) Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* and (xii) Violation of California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.

## PARTIES

37. Plaintiff Adeline Pattison is a citizen of the State of Florida residing in Lake County, where she intends to remain, and brings this action in an individual capacity and on behalf of all others similarly situated.

38. Plaintiff Dominique Durso is a citizen of the State of New York residing in Kings County, where she intends to remain, and brings this action in an individual capacity and on behalf of all others similarly situated.

39. Plaintiff Jean Charter is a citizen of the State of California residing in Ventura County, where she intends to remain, and brings this action in an individual capacity and on behalf of all others similarly situated.

40. Plaintiff Liane Tuomala is a citizen of the State of California residing in Orange County, where she intends to remain, and brings this action in an individual capacity and on behalf of all others similarly situated.

41. Plaintiff Michelle Grenon is a citizen of the State of Georgia residing in Jackson County, where she intends to remain, and brings this action in an individual capacity and on behalf of all others similarly situated.

42. Plaintiff Teresa Hale is a citizen of the State of California residing in Los Angeles County, where she intends to remain, and brings this action in an individual capacity and on behalf of all others similarly situated.

43. Plaintiff Zeshaan Ahmed is a citizen of the State of California residing in Orange County, where he intends to remain, and brings this action in an individual capacity and on behalf of all others similarly situated.

44. Plaintiff Myschelle Taylor is a citizen of the State of Georgia residing in the city of Hampton, where she intends to remain, and brings this action in an individual capacity and on behalf of all others similarly situated.

45. Teladoc is a multinational telemedicine and virtual healthcare corporation incorporated in Delaware and headquartered at 2 Manhattanville Road in Purchase, New York 10577. Teladoc provides primary services such as telehealth medical opinions, artificial intelligence and analytics, telehealth devices and licensable platform services as well as on-demand remote medical care. Teladoc is publicly traded, listed on the New York Stock Exchange under the ticker symbol TDOC.

## **JURISDICTION & VENUE**

46. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

47. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA") as the amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and

minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Teladoc.

48. This Court has personal jurisdiction over Teladoc because it operates and maintains its principal place of business in this judicial district. Further, Teladoc is authorized to and regularly conducts business in this judicial district and makes decisions regarding corporate governance and management of the Website in this judicial district including, but not limited to, decisions regarding the privacy and security of Users' Private Information and the incorporation of Pixels, Conversions API and other tracking technologies.

49. Venue is proper in this judicial district under 28 U.S.C. § 1391(a) through (d) for the following reasons: (i) a substantial part of the events giving rise to this action occurred in this judicial district including decisions made by Teladoc's governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiffs' and Class members' Private Information; (ii) Teladoc's principal place of business is located in this judicial district; (iii) Teladoc collects and redistributes Class members' Private Information in this judicial district and (iv) Teladoc caused harm to Class members residing in this judicial district.

## COMMON FACTUAL ALLEGATIONS

### *A. Federal Regulators Make Clear that the Use of Tracking Technologies to Collect & Divulge Private Information Without Informed Consent is Illegal.*

50. This surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue. Both the Federal Trade Commission and the Office for Civil Rights ("OCR") of the Department of Health and Human Services ("HHS") have, in recent months, reiterated the importance of and necessity for data security and privacy concerning health information.

51. For instance, the FTC recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* ***make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.***"[20]

52. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.***
>
> [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[21]

---

[20] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

[21] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the

53. The federal government is taking these violations of health data privacy and security seriously as recent high-profile FTC settlements against several telehealth companies evidence. For example, earlier this year, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook, Google and Criteo, and a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[22]

54. Even more recently, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures

---

FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.

[22] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, Health IT Security, https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy (last visited Jun. 14, 2024); *See* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc (last visited Jun. 14, 2024).

of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[23]

55. Moreover, the Office for Civil Rights at HHS has made clear, in a recent bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the transmission of such protected information violates HIPAA's Privacy Rule:

> **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals'

---

[23] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.htm (noting that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.").

On June 20, 2024, this guidance was vacated *in part* by Judge Pittman of in the Northern District of Texas due to the court finding it in part to be the product of improper rulemaking and it is cited for reference only until the OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n. v. Becerra*, No. 4:23-cv-01110-P, ECF No. 67 (S.D. Tex., Jun. 20, 2024). Notably, the court's order found *only* that the OCR's guidance regarding covered entities disclosing to third parties users' IP addresses while those users navigated *unauthenticated public webpages* ("UPWs") was improper rulemaking. The Order in no way affects or undermines the OCR's guidance regarding covered entities disclosing personal identifiers, such as Google or Facebook identifiers, to third parties while patients were making appointments for particular conditions, paying medical bills or logging into (or using) a patient portal. *See id*. at 3-4, 31, n. 8 (vacating the OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document."). The FTC bulletin on the same topics remains untouched as do the FTC's enforcement actions against healthcare providers for committing the same actions alleged herein).

> HIPAA-compliant authorizations, would constitute impermissible disclosures.[24]

56. The OCR Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[25]

57. Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to monetize their Users' Private Information.

58. For instance, THE MARKUP reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Facebook a packet of data whenever a person clicked a button to schedule a doctor's appointment.[26]

---

[24] *Id*.

[25] *Id.* (emphasis added).

[26] *See* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

59. And, in the aptly titled report *"Out of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, a joint investigation by STAT and THE MARKUP of 50 direct-to-consumer telehealth companies reported that telehealth companies or virtual care websites were providing sensitive medical information they collect to the world's largest advertising platforms.[27]

60. Many telehealth sites had at least one tracker—from Meta, Google, TikTok, Bing, Snap, Twitter, LinkedIn and/or Pinterest—that collected patients' answers to medical intake questions.[28]

61. In the case of Teladoc, it appears to have installed at least the following tracking pixels: Google Ads, LinkedIn Ads, Bing, New Relic and Facebook.

***B. Background on the use of Tracking Pixels.***

62. Pixels are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting, for example, serving online advertisements to people who have previously engaged with a business's website—and other marketing.

63. Here, a User's web browser executes the Pixels via instructions within each webpage of Teladoc's Website to communicate certain information (within parameters set by Teladoc) directly to the corresponding Pixel Information Recipients—at the same time as the User's browser is sending this information to Teladoc.

---

[27] Todd Feathers, Katie Palmer (STAT) & Simon Fondrie-Teitler, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies: An investigation by The Markup and STAT found 49 out of 50 telehealth websites sharing health data via Big Tech's tracking tools*, The Markup (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies .

[28] *See id.* (noting that "[t]rackers on 25 sites, including those run by industry leaders Hims & Hers, Ro, and Thirty Madison, told at least one big tech platform that the user had added an item like a prescription medication to their cart, or checked out with a subscription for a treatment plan").

64. The Pixels can also share the Users' identifying information for easy tracking via "cookies"[29] stored on their computer by any of the Pixel Information Recipients with which they have an account. For example, Facebook stores or updates a Facebook-specific cookie every time a person accesses their Facebook account from the same web browser, that identifies the person to Facebook.

65. The Meta Pixel can access this cookie and send certain identifying information like the User's Facebook ID to Facebook along with the other data relating to the User's Website inputs. The same is true for the other Pixel Information Recipients, which also create cookies that are stored in the User's computer and accessed by the Pixels to identify the User.

66. The Pixels are programmable, meaning that Teladoc controls which of the webpages on the Website contain the Pixels and which events are tracked and transmitted to the Pixel Information Recipients.

67. Teladoc has utilized Pixels and other tracking technologies since at least November 2020.

68. Teladoc used the data it collected from Plaintiffs and Class Members, without their consent, to improve its advertising and bolster its revenues.

[29] "Cookies are small files of information that a web server generates and sends to a web browser Cookies help inform websites about the user, enabling the websites to personalize the user experience." *See* https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jun. 14, 2024).

### *C. Background on the Process for Using Conversions API.*

69. Facebook Conversions API and similar tracking technologies allow businesses to send web events, such as clicks, form submissions, keystroke events and other user actions performed by the user on the Website, from their own servers to Facebook and other third parties.[30]

70. Conversions API creates a direct and reliable connection between marketing data (such as website events and offline conversations) from Teladoc's server to Facebook.[31] In doing so, Teladoc stores Plaintiffs' and Class Members' Private Information on its own server and then transmits it to unauthorized third parties, i.e., Facebook.

71. Conversions API is an alternative method of tracking versus the Meta Pixel because no privacy protections on the user's end can defeat it. This is because it is "server-side" implementation of tracking technology, whereas the Pixels are "client-side"—executed on users' computers in their web browsers.

72. Because Conversions API is server-side, it cannot access the Facebook c_user cookie to retrieve the Facebook ID.[32] Therefore, other roundabout methods of linking the user to their Facebook account are employed.[33] For example, Facebook has an entire page within its

---

[30] *See* https://revealbot.com/blog/facebook-conversions-api/ (last visited Jun. 14, 2024).

[31] *See* https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Jun. 14, 2024).

[32] "Our systems are designed to not accept customer information that is unhashed Contact Information, unless noted below. Contact Information is information that personally identifies individuals, such as names, email addresses and phone numbers, that we use for matching purposes only." *See* https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters/ (last visited Jun. 14, 2024).

[33] "Sending additional customer information parameters may help increase Event Match Quality. Only matched events can be used for ads attribution and ad delivery optimization, and the higher the matching quality, the better." https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices/#req-rec-params (last visited Jun. 14, 2024).

developers' website about how to de-duplicate data received when both the Facebook Pixel and Conversions API are executed.[34]

73. Conversions API tracks the user's website interaction, including Private Information being shared, and then transmits this data to Facebook and other third parties. Facebook markets Conversions API as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[35]

74. Teladoc installed the Meta Pixels and, upon information and good faith belief, Conversions API, as well as other tracking technologies, on many (if not all) of the webpages within the Website (including the member-only patient portal) and programmed or permitted those webpages to surreptitiously share patients' private and protected communications with the Pixel Information Recipients—communications that included Plaintiffs' and Class Members' Private Information.

### D. *Teladoc's Method of Transmitting Plaintiffs' & Class Members' Private Information via Pixels & Conversions API.*

75. In order to use its online services, customers must provide Teladoc, at a minimum, the following information:

a. consumers' names and dates of birth;

b. email addresses, residential addresses, and phone numbers;

c. gender and age;

---

[34] *See* https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events (last visited Jun. 14, 2024).

[35] *About Conversions API*, https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Jun. 14, 2024).

d. health conditions;

e. health insurance information

f. medical diagnoses and treatment information and

g. prescriptions and medication information.

76. As a result, Users communicate Private Information via the Website, including private and confidential information regarding their health.

77. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (computer, tablet or smartphone) accesses web content through a web browser (*e.g.*, Google's Chrome, Mozilla's Firefox, Apple's Safari and/or Microsoft's Edge browsers).

78. Every website is hosted by a computer "server" that holds the website's contents. The entity(ies) in charge of the website exchange communications with users' client devices as their web browsers query the server through the internet.

79. Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") requests and HTTP or HTTPS responses, and any given browsing session may consist of thousands of individual HTTP requests and HTTP responses, along with corresponding cookies:

a. **HTTP request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL and can include cookies. POST Requests can send a large amount of data outside of the URL. (For instance, uploading a PDF to file a motion to a court.)

b. **Cookies**: a small text file that can be used to store information on the client device that can later be communicated to a server or servers. Cookies are sent with HTTP requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely

different website.

c. **<u>HTTP response</u>**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP request. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data.

80. A patient's HTTP request essentially asks Teladoc's Website to retrieve certain information (such as a set of health screening questions). The HTTP response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons and other features that appear on the participants' screens as they navigate Teladoc's Website.

81. Every website is comprised of Markup and "Source Code." Source Code is a simple set of instructions that commands the website user's browser to take certain actions when the webpage first loads or when a specified event triggers the code.

82. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP requests quietly executed in the background without notifying the web browser's user.

83. The Pixels are Source Code that does just that—they surreptitiously transmit a Website User's communications and inputs to the corresponding Pixel Information Recipient, much like a traditional wiretap. When individuals visit Teladoc's Website via an HTTP request to Teladoc's server, Teladoc's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Pixels).

84. For example, when a User visits www.teladochealth.com, and clicks the "Register Now" link, the User's web browser automatically sends an HTTP Request to Defendant's web server. The Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage as depicted in the image below.




**Figure 1. A User starts the process by clicking the "Register Now" button.**

85. The image above represents the Markup for this particular webpage, and it is the only thing the User sees or is aware of when they view and interact with this particular webpage. The user does not see the Defendant's Source Code or any HTTP Requests sent in the "background" while the webpage is operating. In fact, this unseen Source Code manipulated users' browsers by secretly including Pixel code in the webpage's Source Code, which was programmed to silently monitor and report the user's activity. When the webpage loads into the user's browser, the Pixel code is triggered which sends an HTTP Request to Facebook including the user's c_user id (that personally identifies the person to Meta) and the URL, informing Facebook that the user is seeking telehealth services.

86. Thereafter, when an event triggers the Pixel code, the code instructs the web browser to duplicate user communications (HTTP Requests) intended for Defendant and to send

those communications to Facebook at the same time they are sent to Defendant. This occurs because the Pixel that was embedded in Defendant's Source Code is programmed to automatically track and transmit a user's communications, and this occurs contemporaneously, invisibly and without the User's knowledge.

87. Figure 2, below, demonstrates that after selecting the "Register Now" button, users are required to answer multiple questions about their personal, medical, and financial condition.





# [redacted]'s medical history

A complete and accurate medical history is important for our providers to ensure they have the information they need to provide your treatment plan.

View or Print Your Medical History.

*Required

Health Demographics

Height (feet) *

Height (inches) *

Weight (lbs) *

Medication(s)

Add new

No medication history

Allergies

Add new

No allergy history

Lifestyle

Do you smoke / use tobacco?

Do you drink alcohol?

Have you traveled overseas in the past 2 months?

When was your last visit to the doctor? *
MM/DD/YYYY

**Figure 2. Users are required to answer questions regarding their Private Information.**

88. Thus, Teladoc is, in essence, handing its patients a wiretapped phone and, once the webpage is loaded into the patient's browser, the software-based wiretaps are quietly waiting for

private communications on the webpage to trigger the Pixels, which then intercept those communications—intended only for Teladoc—and transmit those communications to the corresponding Pixel Information Recipient.

89. Third parties like the Pixel Information Recipients place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can uniquely identify the user associated with the information intercepted (in this case, highly sensitive Private Information).

90. Teladoc intentionally configured Pixels installed on its Website to capture both the "characteristics" of individual patients' communications with Teladoc's Website (their IP addresses, Facebook ID, cookie identifiers, device identifiers and account numbers) and the "content" of these communications (the buttons, links, pages and tabs they click and view).

91. Teladoc also deposits cookies named _fbp, _ga and _gid onto Plaintiffs' and Class Members' computers and mobile devices. These are cookies associated with the third-parties Facebook and Google but which Teladoc deposits on Plaintiffs' and Class Members' computing devices by disguising them as first-party cookies. And without any action or authorization, Teladoc commands Plaintiffs' and Class Members' computing devices to contemporaneously re-direct the Plaintiffs' and Class Members' identifiers and the content of their communications to Facebook and Google.

92. The _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Teladoc's use of the Meta Pixel.[36] The _fbp cookie emanates from Teladoc's Website as a putative first party cookie but is transmitted to Facebook through cookie-synching technology that hacks around the same-origin policy.

---

[36] The letters fbp are an acronym for Facebook Pixel.

93. The __ga and _gid cookies operate similarly to Google.

94. Furthermore, if the patient is also a Facebook user, the information Facebook receives is linked to the patient's Facebook profile (via their Facebook ID or "c_user id" cookie), which includes other identifying information.[37]

95. In this instance, Teladoc begins tracking its patients from the moment they land on the Website via Meta Pixel with ID number 789937024472962.

96. The Pixel is configured to capture a number of "events" as the User browses the website, registers as a patient and/or views and chooses available providers and treatments. The "events" include, but not limited to, "PageView," "Microdata," "SubscribedButtonClick" and "ViewContent."

97. These events disclose the User/patient's specific medical condition, the fact that the User is searching for specific treatments and/or doctors for their sensitive medical condition, that the patient is making an appointment with a specialist for their specific medical condition and the frequency of such appointments—along with the patient's name, their unique Facebook ID and other personal identifiers such as their device identifiers and their IP address.[38]

---

[37] Facebook uses several cookies to identify users, including cookies named c_user, datr, fr, and _fbp. The c_user cookie identifies Facebook users. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has only one unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications. The Facebook datr cookie identifies the web browser the patient is using. It is an identifier unique to each patient's specific web browser and is another way Meta can identify Facebook users (Facebook keeps a record of every datr cookie identifier associated with each of its users). The Facebook fr cookie is an encrypted combination of the c_user and datr cookies.

[38] As discussed, *infra*, each of these categories of information constitutes PHI.

98. Most worryingly, Teladoc installed the Meta Pixel and other third-party tracking codes not only on its public-facing portion of the Website, but on its patient portal webpages as well.

99. Teladoc's Meta Pixel tracked its registered Users as they set up an account, filled out medical questionnaires and provided their medical history (for example, indicating that they have an allergy), and looked for providers and specific treatments, as demonstrated in the image below.




**Figure 3. Source code sending Users' Private Information to Facebook.**

100. The information that Teladoc's Meta Pixel sends to Facebook includes, among other things, patients' PHI and other confidential information.

101. Consequently, when Users visit Teladoc's Website and communicate their Private Information, it is transmitted to Facebook including, but not limited to, patient status, health conditions experienced and treatments sought, physician selected, appointments sought and specific button/menu selections. Additional collected and conveyed information includes instances when patients pay bills and when they self-enroll in the patient portal and/or access their portal via a designated button (or link) on the Website. Each of these activities involves the transmission of sensitive information—such as payment details, personal identifiers required for portal enrollment and portal usage data—which is inevitably communicated to Facebook (and other third parties).

***E. Facebook's Platform & its Business Tools.***

102. Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[39]

103. In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Teladoc, to utilize its "Business Tools" to gather, identify, target and market products and services to individuals.

104. Facebook's Business Tools, including the Meta Pixel, are bits of code that advertisers can integrate into their webpages, mobile applications and servers, to enable the interception and collection of user activity on those platforms.

[39] META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Jun. 14, 2024).

105. The Business Tools are automatically configured to capture "Standard Events," such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[40]

106. Advertisers, such as Teladoc, can track other User actions and can create their own tracking parameters by building a "custom event."[41]

107. One such Business Tool is the Meta Pixel, which "tracks the people and type of actions they take."[42]

108. When a user accesses a webpage that is hosting the Meta Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers—traveling from the user's browser to Facebook's server.

109. This is precisely the type of identifying information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of patients.[43] Plaintiffs' and Class Members identities can be easily determined based on the Facebook ID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

---

[40] *Specifications for Facebook Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Jun. 14, 2024); *see also* META PIXEL, GUIDES, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Jun. 14, 2024); BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last visited Jun. 14, 2024); APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jun. 14, 2024).

[41] ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited Jun. 14, 2024).

[42] *Retargeting*, *supra* note 8.

[43] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Jun. 14, 2024).

110. After intercepting and collecting this information, Facebook processes, analyzes, and assimilates it into datasets like Core Audiences and Custom Audiences. When the website visitor is also a Facebook user, the information collected via the Meta Pixel is associated with the user's Facebook ID that identifies their name and Facebook profile—their real-world identity.

111. The pixel collects data regardless of whether the visitor has an account. Facebook maintains "shadow profiles" on users without Facebook accounts, and links the information collected via the Meta Pixel to the user's real-world identity using their shadow profile.[44]

112. A user's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access and view the user's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

113. The Private Information disclosed via the Pixel allows Facebook to know that a specific patient is seeking confidential medical care and the type of medical care being sought. Facebook then uses that information to sell advertising to Teladoc and other advertisers and/or sells that information to marketers who use it to online target Plaintiffs and Class Members.

114. Thus, the communications between patients and Teladoc, which are necessary to achieve the purpose of Teladoc's Website, are received by Teladoc and stored on their server before Conversions API collects and sends the Private Information contained in those

[44] *See* Russell Brandom, *Shadow Profiles Are The Biggest Flaw In Facebook's Privacy Defense*, (Apr 11, 2018), https://www.theverge.com/2018/4/11/17225482/facebook-shadow-profiles-zuckerberg-congress-data-privacy (last visited Jun. 14, 2024).

communications directly from Teladoc to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.[45]

115. In this case, Teladoc employed the Pixels and, upon information and good faith belief, Conversions API, among other tracking technologies, to intercept, duplicate and re-direct Plaintiffs' and Class Members' Private Information to Facebook and the other Pixel Information Recipients.

### *F. Teladoc's Use of the Pixels Violated Its Own Privacy Policies.*

116. Teladoc breached Plaintiffs' and Class Members' right to privacy by unlawfully disclosing their Private Information to the Pixel Information Recipients.

117. Specifically, Plaintiffs and Class Members had a reasonable expectation of privacy based on Teladoc's own representations to Plaintiffs and the Class that Teladoc would not disclose their Private Information to third parties.

118. Defendant did not ask users, including Plaintiffs, whether they consent to be wiretapped via the Pixel or to external sharing of their Private Information prior to submitting their Personal Information to Defendant. Users are never told that their electronic communications are being wiretapped via the Pixel and other third-party tracking codes.

119. Teladoc did not inform Plaintiffs that it shared their Private Information with Facebook and the other Pixel Information Recipients. Moreover, Teladoc's Privacy Policy did not

---

[45] Although prior to discovery there is no way to confirm that Teladoc has implemented Conversions API or another workaround (as that would require accessing the host server), Facebook instructs website owners like Teladoc to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Teladoc "to share website events [with Facebook] that the pixel may lose." *See* https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited Jun. 14, 2024). Thus, it is reasonable to infer that Teladoc is utilizing the Conversions API workaround.

state that User and patient Private Information would be shared with Facebook or other unauthorized third parties.

120. To the contrary, Teladoc acknowledges that PHI it receives from its Users must be protected under "strict security safeguards," and claims that it bases its "security program on complying with state and federal law, including the HIPAA Security Regulations, as well as industry best practices."[46]

121. Moreover, Teladoc states that it "will not share your PHI for other purposes not described in this Notice unless you give us your written permission."[47] Specifically, the use of PHI for marketing purposes requires written permission.[48]

122. Plaintiffs and Class Members did not provide written permission to use their PHI for marketing purposes.

123. By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, Teladoc violated its own Privacy Policy and breached Plaintiffs' and Class Members' right to privacy and unlawfully disclosed their Private Information.

### ***G. Teladoc's Use of the Pixels Violates HIPAA.***

124. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient or household member of a patient for marketing purposes without the patients' express written authorization.

---

[46] *See* Teladoc's Notice of Privacy Practices, https://www.teladochealth.com/legal/notice-of-privacy-practices/ (last visited Jun. 14, 2024).

[47] *Id.*

[48] *Id.*

125. Guidance from HHS instructs healthcare providers that patient status alone is protected by HIPAA.

126. HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

127. The Privacy Rule broadly defines protected health information as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

128. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

A. Names;
…
H. Medical record numbers;
…
J. Account numbers;
…
M. Device identifiers and serial numbers;
N. Web Universal Resource Locators (URLs);
O. Internet Protocol (IP) address numbers; … and

P. Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

129. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

130. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be PHI.

131. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[49]

132. Consistent with this restriction, HHS has issued guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third

[49] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Jun. 14, 2024).

party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[50]

133. Here, as described, *supra*, Teladoc provided patient information to third parties in violation of the Privacy Rule and its own Privacy Policy.

134. HIPAA also requires Teladoc to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1) – which Teladoc failed to do.

135. Teladoc further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Teladoc created, received, maintained and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Teladoc in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

[50] *Marketing*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Jun. 14, 2024).

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3), and

f. Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

136. Commenting on a June 2022 report discussing the use of Meta Pixels by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[51]

137. Teladoc's placing a third-party tracking code on its Website is a violation of Plaintiffs' and Class Members' privacy rights under federal law. While Plaintiffs do not bring a claim under HIPAA itself, this violation demonstrates Teladoc's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

***H. Teladoc's Use of the Pixels Violates New York Standards.***

138. New York State has long been a national leader in protecting the confidentiality of personal medical information and has strict privacy standards for medical records.

139. New York requires patient consent before a physician can disclose an individual's medical information to another treating physician and limits disclosure to immediately relevant information.[52]

---

[51] '*Deeply Troubled'*: *Security experts worry about Facebook trackers on hospital sites*, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers (last visited Jun. 14, 2024).

[52] *See* New York Public Health Law § 18(6).

140. Even stronger protections restrict the release of certain especially sensitive information regarding genetic tests,[53] mental health,[54] medical treatment of adolescents,[55] sexually transmitted infections[56] and HIV.[57]

141. Accordingly, Teladoc's decision to embed the Pixels and disclose Users Private Information without consent violated New York standards.

## *I. Teladoc Violated Industry Standards.*

142. It is a cardinal rule that a medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

143. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

144. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

145. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services.

---

[53] *See* New York Civil Rights Law § 79-l.

[54] *Id.*, § 79-j; New York Public Health Law § 18(1)(e); Mental Hygiene Law § 33.13.

[55] *See Barriers to the Exchange of Pediatric Health Information*, NY eHealth Collaborative Privacy & Security Minor Consent Tiger Team, pages 7-8 (July 2, 2010) (describing numerous state law provisions and state and federal case law that create confidentiality rights for minors seeking health care on their own).

[56] *See* New York Public Health Law Chapter 45, § 2306.

[57] *See* New York Public Health Law Chapter 45, Article 27-F.

> Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

146. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[58]

147. Teladoc's use of the Pixels also violates FTC data security guidelines. The FTC has promulgated numerous guides for businesses, which highlight the importance of implementing reasonable data security practices.

148. The FTC's October 2016 publication *Protecting Personal Information: A Guide for Business*[59] established cyber-security guidelines for businesses. These guidelines state that businesses should protect the personal patient information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network vulnerabilities and implement policies to correct any security problems.

149. In fact, the FTC has recently brought enforcement actions against several healthcare companies, including Premom, BetterHelp, GoodRx and Flow Health for conveying

---

[58] AMA Principles of Medical Ethics: I, IV, *Chapter 3: Opinions on Privacy, Confidentiality & Medical Records*, https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (last visited Jun. 14, 2024).

[59] *See* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jun. 14, 2024).

information—or enabling an inference—about their consumers' health to unauthorized third parties without the consumers' consent.

150. Like the telehealth companies fined by the FTC in recent years, Teladoc failed to implement these basic, industry-wide data security practices.

***J. Users' Reasonable Expectation of Privacy.***

151. Plaintiffs and Class Members were aware of Teladoc's duty of confidentiality when they sought medical services from Teladoc.

152. Indeed, when Plaintiffs and Class Members provided their Private Information to Teladoc, they each had a reasonable expectation that the information would remain confidential and that Teladoc would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

153. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

154. For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[60]

155. Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class Members.

---

[60] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited Jun. 14, 2024).

### *K. Unique Personal Identifiers are PHI.*

156. While not all health data is covered under HIPAA, the law specifically applies to healthcare providers, health insurance providers and healthcare data clearinghouses.[61]

157. The HIPAA privacy rule sets forth policies to protect all individually identifiable health information that is held or transmitted, and there are approximately 18 HIPAA Identifiers that are considered personally identifiable information ("PII"). This information can be used to identify, contact or locate a single person or can be used with other sources to identify a single individual.

158. These HIPAA Identifiers, as relevant here, include names, dates related to an individual, email addresses, device identifiers, web URLs and IP addresses.[62]

159. Unique personal identifiers become PHI when they can be associated with personal health information.[63]

160. Teladoc improperly disclosed Plaintiffs' and Class Members' HIPAA identifiers, including their names, emails, dates they sought treatments, computer IP addresses, device

---

[61] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook*, The Markup (June 21, 2022), https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook (stating that "[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations").

[62] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Jun. 14, 2024).

[63] *See id.* ("[p]rotected health information includes many common identifiers (e.g., name, address, birth date, Social Security Number) when they can be associated with the health information listed above.").

identifiers and web URLs visited to the Pixel Information Recipients through their use of the Pixels *in addition to* services selected, patient statuses, medical conditions, treatments, provider information and appointment information.

161. An IP address is a number that identifies the address of a device connected to the Internet. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by Internet service providers, websites and third-party tracking companies to facilitate and track Internet communications.

162. Facebook tracks every IP address ever associated with a Facebook user (and with non-users through shadow profiles). Google also tracks IP addresses associated with Internet users.

163. Facebook, Google and other third-party marketing companies track IP addresses to target individual homes and their occupants with advertising.

164. Under HIPAA, an IP address is considered personally identifiable information, which is defined as including "any unique identifying number, characteristic or code" and specifically listing IP addresses among examples. *See* 45 C.F.R. § 164.514 (2).

165. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

166. Consequently, Teladoc's disclosure of Plaintiffs' and Class Members' IP addresses violated HIPAA and industry-wide privacy standards because it was connected to their past, present, or future medical conditions and treatment.

### L. *Teladoc Was Enriched & Benefitted from the Use of the Pixel & other Tracking Technologies that Enabled the Unauthorized Disclosures Alleged Herein*

167. One of the primary reasons that Teladoc decided to embed Pixels and other tracking technologies on its Website was to improve marketing through creating campaigns that maximize conversions (thereby decreasing Teladoc's costs and boosting its revenues).

168. After receiving individually identifiable patient health information communicated on the Teladoc Website, Facebook forwards this data, and its analysis of this data, to Teladoc.

169. Teladoc then uses this data and analysis for its own commercial purposes that include understanding how Users utilize its Website. Teladoc also receives an additional commercial benefit from using Facebook's tracking tools such as the Meta Pixel and Conversions API, namely being able to serve more targeted advertisements to existing and prospective patients on Facebook and Instagram.

170. Facebook advertises its Pixel as a piece of code "that can help you better understand the ***effectiveness of your advertising*** and the actions people take on your site, like visiting a page or adding an item to their cart. You'll also be able to see when customers took an action after seeing your ad on Facebook and Instagram, which can help you with retargeting. And when you use the Conversions API alongside the Pixel, it creates a more reliable connection that helps the delivery system ***decrease your costs***."[64]

171. Retargeting is a form of online marketing that targets Users with ads based on previous internet communications and interactions. In particular, retargeting operates through code

---

[64] *What is the Meta Pixel,* https://www.facebook.com/business/tools/meta-pixel (emphasis added) (last visited Jun. 14, 2024).

and tracking pixels placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[65]

172. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Facebook via the tracking technologies and the Pixel embedded on, in this case, Teladoc's website. For example, if a new member signs up to use Teladoc, their information is sent to Facebook. Facebook can then use its data on the User to find more users to click on a Teladoc ad and ensure that those users targeted are more likely to convert.[66]

173. Through this process, the Meta Pixel loads and captures as much data as possible when a User loads a healthcare website that has installed the Pixel. The information the Pixel captures, "includes URL names of pages visited, and actions taken—all of which could be potential examples of health information."[67]

174. Plaintiffs' and Class Members' Private Information has considerable value as highly monetizable data, especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

175. In exchange for disclosing the Private Information of their account holders and patients, Teladoc is compensated by the Pixel Information Recipients in the form of enhanced advertising services and more cost-efficient marketing on their platform.

---

[65] *The complex world of healthcare retargeting,* https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/ (last visited Jun. 14, 2024).

[66] *See, e.g.*, *How To Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), *https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking* (last visited Jun. 14, 2024).

[67] *Id*.

176. But companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many such trackers are not HIPAA-compliant or are only HIPAA-compliant if certain steps are taken.[68]

177. For example, Freshpaint, a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant. They don't sign BAAs, and the Meta Pixel acts like a giant personal user data vacuum sending PHI to Meta servers," and "[i]f you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now."[69]

178. Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[70]

179. Whether a User has a Facebook profile is not indicative of damages because Facebook creates shadow profiles, and at least one court has recognized that the pixels' ability to track comprehensive browsing history is also relevant. *See, e.g.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1078–79 (N.D. Cal. 2021) (finding a reasonable expectation of privacy where Google combined the unique identifier of the user it collects from Websites and Google Cookies that it collects across the internet on the same user).

---

[68] *See The guide to HIPAA compliance in analytics*, https://campaign.piwik.pro/wp-content/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant) (last visited Jun. 14, 2024).

[69] *How To Make Facebook Ads HIPAA Compliant And Still Get Conversion Tracking*, *supra* note 66.

[70] *The complex world of healthcare retargeting, supra*, note 65.

180. Teladoc retargeted patients and potential patients to get more people to purchase their services. These patients include Plaintiffs and Class Members.

181. Thus, utilizing the Pixels directly benefits Teladoc by, among other things, reducing the cost of advertising and retargeting.

### *M. Plaintiffs' Private Information is Extremely Valuable.*

182. Plaintiffs' and Class Members' Private Information had value, and Teladoc's disclosure and interception harmed Plaintiffs and the Class by not compensating them for the value of their Private Information and, in turn, decreasing the value of their Private Information.

183. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

184. The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

185. The robust market for Internet user data has been analogized to the "oil" of the tech industry.[71]

186. A 2015 article from TechCrunch accurately noted that "[d]ata has become a strategic asset that allows companies to acquire or maintain a competitive edge."[72] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

---

[71] *See* https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited Jun. 14, 2024).

[72] *See* https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited Jun. 14, 2024).

187. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data (after costs).[73] That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

188. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[74]

189. This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[75]

190. There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

---

[73] *See What Your Data is Really Worth to Facebook* (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/ (last visited Jun. 14, 2024).

[74] Paul M. Schwartz, Property, Privacy, and Personal Data, 117 Harv. L. Rev. 2055, 2056-57 (2004).

[75] *See* Kevin Mercadante, *10 Apps for Selling Your Data for Cash*, Wallet Hacks (Nov. 18, 2023), https://wallethacks.com/apps-for-selling-your-data/.

191. Courts recognize the value of personal information and the harm when it is disclosed without consent. *See, e.g., In re Facebook Privacy Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) (holding that plaintiffs' allegations that they were harmed by the dissemination of their personal information and by losing the sales value of that information were sufficient to show damages for their breach of contract and fraud claims); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) (recognizing "the value that personal identifying information has in our increasingly digital economy").

192. Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

193. Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

194. The value of health data is well-known and various reports have been conducted to identify its value.

195. Specifically, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[76]

[76] *See Valuing Healthcare Data,* The Value Examiner (July/Aug. 2023), https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf.

196. Trustwave Global Security published a report entitled *The Value of Data*. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[77]

197. The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[78]

198. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[79]

199. The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold is evidence of the value of PHI.

200. These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

201. In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

---

[77] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (citing https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf) (last visited Jun. 14, 2024).

[78] *See* https://time.com/4588104/medical-data-industry/ (last visited Jun. 14, 2024).

[79] *See* Christina Farr, *Hospital execs say they are getting flooded with requests for your health data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

202. Teladoc gave away Plaintiffs' and Class Members' communications and transactions on its Digital Platforms without permission.

203. The unauthorized access to Plaintiffs' and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website Users, including Plaintiffs and Class Members.

204. Plaintiffs have a continuing interest in ensuring that their future communications with Teladoc are protected and safeguarded from future unauthorized disclosure.

**REPRESENTATIVE PLAINTIFFS' EXPERIENCES**

***Plaintiff Adeline Pattison***

205. Beginning in or around early 2020, Plaintiff Pattison started to utilize Teladoc's Website on her personal phone to create an account, research conditions and treatments, search for support groups, doctors and schedule appointments.

206. Plaintiff Pattison used Teladoc's Website most recently in April 2023 for a [redacted].

207. Plaintiff Pattison has also utilized Teladoc's Website to make appointments with a [redacted].

208. While seeking those services and treatments, Teladoc required Plaintiff to provide—and Plaintiff provided— Private Information including her name, email address and medical conditions, including [redacted] Additionally, Teladoc required Plaintiff to provide additional PHI, including [redacted], whether she was on medications and, if so, [redacted], and which of their services she wanted to use.

209. While searching Teladoc's specific services, the Website presented numerous guided questions, and then asked Plaintiff to respond to questions to confirm its hypothesis of her

condition. For Plaintiff's conditions, Teladoc required Plaintiff to provide information regarding her medications, and then asked her personal questions regarding her [redacted].

210. While Plaintiff Pattison was a User of Teladoc's services, she never consented to or authorized the use of her Private Information by third parties or to Teladoc enabling third parties to access, interpret and use such Private Information.

211. Plaintiff Pattison had an active Facebook account while she used Teladoc's services and she accessed Teladoc's Website while logged into her Facebook account on the same device.

212. Plaintiff Pattison does not post about her medical conditions on social media.

213. After providing Private Information to Teladoc through the Website, Plaintiff Pattison began seeing targeted health ads as she scrolled through her Facebook account, including ads for a [redacted] in her area.

***Plaintiff Dominique Durso***

214. In 2019 Plaintiff Durso started to utilize Defendant's Website on her personal phone and laptop to create an account, research conditions and treatments, search for doctors and schedule appointments. Plaintiff used Defendant's Website most recently in early October of 2023.

215. While seeking those services and treatments, Teladoc required Plaintiff Durso to provide—and Plaintiff provided—Private Information including her name, email address and medical conditions, including [redacted] Additionally, Teladoc required Plaintiff to provide additional PHI, including weight, height, blood pressure, [redacted]

[redacted] whether she was on medications and, if so, which ones, and which of their services she wanted to use, [redacted]

216. While searching Teladoc's specific services, the Website presented numerous guided questions, and then asked Plaintiff Durso to respond to the questions to confirm its hypothesis of her condition(s).

217. After providing her Private Information, Plaintiff Durso was [redacted]

218. While Plaintiff Durso was a User of Teladoc's services, she never consented to or authorized the use of her Private Information by third parties or to Defendant enabling third parties to access, interpret and use such Private Information.

219. Plaintiff Durso had an active Facebook account while she used Defendant's services, and she accessed Defendant's Website while logged into her Facebook account on the same devices.

220. Plaintiff Durso does not post about her medical conditions on social media.

221. After providing Private Information to Defendant through the Website, Plaintiff Durso began seeing targeted health ads as she scrolled through her Facebook account, related to [redacted] and medications prescribed to her by Teladoc providers [redacted]

***Plaintiff Jean Charter***

222. In or around February or March of 2021, Plaintiff Charter started to utilize Defendant's Website on her personal phone (and later on her computer) to create an account, research conditions and treatments, search for doctors and schedule appointments. Plaintiff used Defendant's Website most recently in early December of 2023.

223. While seeking those services and treatments, Teladoc required Plaintiff to provide—and Plaintiff provided— Private Information including her name, email address and medical conditions, including [redacted] Additionally, Teladoc required Plaintiff to provide additional PHI, including [redacted] whether she was on medications and, if so, which ones, and which of their services she wanted to use, such as [redacted]

224. While searching Teladoc's specific services, the Website presented numerous guided questions, and then asked Plaintiff to respond to questions to confirm its hypothesis of her condition. For Plaintiff's conditions, Teladoc required Plaintiff to provide information regarding her medications, and then asked her personal questions [redacted].

225. While Plaintiff Charter was a User of Teladoc's services, she never consented to or authorized the use of her Private Information by third parties or to Defendant enabling third parties to access, interpret and use such Private Information.

226. Plaintiff Charter had an active Facebook account while she used Defendant's services, and she accessed Defendant's Website while logged into her Facebook account on the same devices.

227. Plaintiff Charter does not post about her medical conditions on social media.

228. After providing Private Information to Defendant through the Website, Plaintiff Charter began seeing targeted health ads as she scrolled through her Facebook account, related to [redacted] and medications prescribed to her by Teladoc providers ([redacted]).

***Plaintiff Liane Tuomala***

229. In or around October of 2023, Plaintiff Tuomala started to utilize Defendant's Website on her personal phone (and later on her computer) to create an account, research conditions and treatments, search for doctors and schedule appointments. Plaintiff used Defendant's Website most recently in early December of 2023.

230. While seeking those services and treatments, Teladoc required Plaintiff Tuomala to provide—and Plaintiff provided— Private Information including her name, email address and medical conditions, including [redacted] Additionally, Teladoc required Plaintiff to provide additional PHI, including weight, height, blood pressure, whether she was on medications and, if so, which ones, and which of their services she wanted to use, such as [redacted]

231. While searching Teladoc's specific services, the Website presented numerous guided questions, and then asked Plaintiff Tuomala to respond to questions to confirm its hypothesis of her condition. For Plaintiff's conditions, Teladoc required Plaintiff to provide information regarding her medications, and then asked her personal questions regarding her [redacted]

232. While Plaintiff Tuomala was a User of Teladoc's services, she never consented to or authorized the use of her Private Information by third parties or to Defendant enabling third parties to access, interpret and use such Private Information.

233. Plaintiff Tuomala had an active Facebook account while she used Defendant's services, and she accessed Defendant's Website while logged into her Facebook account on the same devices.

234. Plaintiff Tuomala does not post about her medical conditions on social media.

235. After providing Private Information to Defendant through the Website, Plaintiff Tuomala began seeing targeted health ads as she scrolled through her Facebook account, related to [redacted] medications prescribed to her by Teladoc providers [redacted], [redacted].

***Plaintiff Michelle Grenon***

236. In or around 2020, Plaintiff Grenon started to utilize Teladoc's Website on her personal phone to create an account, research conditions and treatments, search for doctors and schedule appointments.

237. While seeking those services and treatments, Teladoc required Plaintiff to provide—and Plaintiff provided— Private Information including her name, email address and medical conditions, including [redacted]. Additionally, Teladoc required Plaintiff to provide additional PHI, including [redacted], whether she was on medications and, if so, [redacted], and which of their services she wanted to use.

238. While searching Teladoc's specific services, the Website presented numerous guided questions, and then asked Plaintiff to respond to questions to confirm its hypothesis of her condition. For Plaintiffs' conditions, Teladoc required Plaintiff to provide information regarding her medications, and then asked her personal questions regarding her medical history [redacted].

239. While Plaintiff Grenon was a User of Teladoc's services, she never consented to or authorized the use of her Private Information by third parties or to Teladoc enabling third parties to access, interpret and use such Private Information.

240. Plaintiff Grenon had an active Facebook account while she used Teladoc's services, and she accessed Teladoc's Website while logged into her Facebook account on the same device.

241. Plaintiff Grenon does not post about her medical conditions on social media.

242. After providing Private Information to Teladoc through the Website, Plaintiff Grenon began seeing targeted health ads as she scrolled through her Facebook account, related to [redacted].

***Plaintiff Teresa Hale***

243. Beginning in or around June 2023, Plaintiff Hale started to utilize Teladoc's Website on her personal phone to create an account, search for doctors to schedule appointments, and receive prescriptions for medication.

244. Plaintiff Hale used Teladoc's Website most recently, in June of July 2023, to [redacted]

245. While seeking those services and treatments, Teladoc required Plaintiff Hale to provide—and Plaintiff provided— Private Information including her name, email address and medical conditions, including [redacted]. Additionally, Teladoc required Plaintiff to provide additional PHI, including weight, height, blood pressure, whether she was on medications and, if so, which ones, and which of their services she wanted to use.

246. While searching Teladoc's specific services, the Website presented numerous guided questions and then asked Plaintiff to respond to questions to confirm its hypothesis of her condition. For Plaintiffs' conditions, Teladoc required Plaintiff to provide information regarding her medications, and then asked her personal questions regarding [redacted].

247. While Plaintiff Hale was a User of Teladoc's services, she never consented to or authorized the use of her Private Information by third parties or to Teladoc enabling third parties to access, interpret and use such Private Information.

248. Plaintiff Hale had an active Facebook account while she used Teladoc's services, and she accessed Teladoc's Website while logged into her Facebook account on the same device.

249. Plaintiff Hale does not post about her medical conditions on social media.

250. After providing Private Information to Teladoc through the Website, Plaintiff Hale began seeing targeted health ads as she scrolled through her Facebook and Instagram accounts, including [redacted] through her use of Teladoc services, such as [redacted].

***Plaintiff Zeshaan Ahmed***

251. Plaintiff Ahmed started to utilize Defendant's Website on his personal phone and laptop prior to 2018 to create an account, research conditions and treatments, search for doctors and schedule appointments. Plaintiff used Defendant's Website most recently in the fall of 2023.

252. While seeking those services and treatments, Teladoc required Plaintiff Ahmed to provide—and Plaintiff provided— Private Information including his name, email address and medical conditions, including [redacted]. Additionally, Teladoc required Plaintiff to provide additional PHI, including weight, height, blood pressure, whether he was on medications and, if so, which ones, and which of their services he wanted to use, such as [redacted].

253. While searching Teladoc's specific services, the Website presented numerous guided questions, and then asked Plaintiff Ahmed to respond to questions to confirm its hypothesis of his condition. For Plaintiff's conditions, Teladoc required Plaintiff to provide information

regarding his medications, and then asked him personal questions regarding his specific health conditions and other medical history including [redacted].

254. While Plaintiff Ahmed was a User of Teladoc's services, he never consented to or authorized the use of his Private Information by third parties or to Defendant enabling third parties to access, interpret and use such Private Information.

255. Plaintiff Ahmed had an active Facebook account while he used Defendant's services, and he accessed Defendant's Website while logged into his Facebook account on the same devices.

256. Plaintiff Ahmed does not post about his medical conditions on social media.

257. After providing Private Information to Defendant through the Website, Plaintiff Ahmed began seeing targeted health ads as he scrolled through his Facebook account, related to [redacted] he sought from Teladoc providers (including ads for [redacted]

***Plaintiff Myschelle Taylor***

258. On February 11, 2021, Plaintiff Taylor signed up for a Teladoc account.

259. As part of the registration process, Plaintiff Taylor provided Teladoc with her Private Information, including her medical history and medical insurance information. Plaintiff Taylor reasonably expected that her communications with Teladoc via its Website were confidential, solely between herself and Teladoc, and that such communications would not be transmitted to or intercepted by a third party.

260. Plaintiff Taylor made use of Teladoc's services on at least one occasion: she attended [redacted].

261. Leading up to [redacted], Plaintiff Taylor [redacted] and experienced [redacted], so she scheduled a telehealth appointment for [redacted]. At the [redacted] virtual visit, Plaintiff Taylor discussed her symptoms with the doctor, [redacted].

262. The doctor determined that she was suffering from [redacted] and prescribed her the [redacted]. The doctor also provided Plaintiff Taylor with a note [redacted].

263. Plaintiff Taylor also has an active Facebook account she regularly accesses using her mobile device and personal computer.

264. Plaintiff Taylor does not post about her medical conditions on social media.

265. After providing Private Information to Defendant through the Website, Plaintiff Taylor began seeing targeted health ads as she scrolled through her Facebook account, related to [redacted].

266. As described herein, Teladoc sent Plaintiff Taylor's sensitive and private PII and health information to third parties, including Facebook, when she accessed Teladoc's website. Additionally, the information Teladoc sent to third parties was linked to Plaintiff Taylor's Facebook ID.

267. Pursuant to the systematic process described herein, Teladoc assisted third parties, including Facebook, with intercepting Plaintiff Taylor's communications, including those that contained PII, protected health information, and related confidential information. Teladoc assisted these interceptions without Plaintiff Taylor's knowledge, consent, or express written authorization.

268. By failing to receive the requisite consent, Teladoc breached confidentiality and unlawfully disclosed Plaintiff Taylor's Private Information.

## TOLLING

269. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know—and had no way of knowing—that their Private Information was intercepted and unlawfully disclosed to the Pixel Information Recipients because Teladoc kept this information secret.

270. Plaintiffs did not learn of Defendant's intercepting of their activities and communications on Defendant's Website until being informed by the undersigned counsel of record shortly before this complaint was filed.

271. Plaintiffs had no reason to believe their Private Information was being intercepted through Defendant's Website, let alone in real time while Plaintiffs were inputting information into Defendant's Website but before Plaintiffs submitted their application. As detailed above, Defendant's privacy policy did not disclose that Defendant was sharing their information with Meta/Facebook. Furthermore, the technologies Defendant embedded on its Website are not visible to the reasonable user—they are invisible and work in the background.

272. As a result, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS ACTION ALLEGATIONS

273. This action is brought by the named Plaintiffs on their behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3) and 23(c)(4).

274. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All persons residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel and other tracking technologies on Teladoc's Website.

275. The Florida Class that Plaintiff Pattison seeks to represent is defined as follows:

> All persons residing in the State of Florida whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel and other tracking technologies on Teladoc's Website.

276. The Georgia Class that Plaintiffs Grenon and Taylor seek to represent is defined as follows:

> All persons residing in the State of Georgia whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel and other tracking technologies on Teladoc's Website.

277. The New York Class that Plaintiff Durso seeks to represent is defined as follows:

> All persons residing in the State of New York whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel and other tracking technologies on Teladoc's Website.

278. The California Class that Plaintiffs Charter, Tuomala, Hale and Ahmed seek to represent is defined as follows:

> All persons residing in the State of California whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel and other tracking technologies on Teladoc's Website.

279. The Nationwide Class and the Florida, Georgia, New York and California Classes are collectively referred to herein as the "Classes."

280. Excluded from the proposed Classes are any claims for personal injury, wrongful death or other property damage sustained by the Classes; and any Judge conducting any proceeding in this action and members of their immediate families.

281. Plaintiffs reserve the right to amend the definitions of the Classes or add subclasses if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded or otherwise modified.

282. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 1 million patients that have been impacted by Teladoc's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Teladoc.

283. **Commonality.** Common questions of law or fact arising from Teladoc's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Teladoc had a duty to protect the Private Information of Plaintiffs and Class Members;

b) Whether Teladoc had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c) Whether Teladoc violated its own privacy policy by disclosing the Private Information of Plaintiffs and Class Members to the Pixel Information Recipients;

d) Whether Teladoc adequately, promptly and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e) Whether Teladoc violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information was being disclosed without their consent;

f) Whether Teladoc adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Private Information;

g) Whether Teladoc engaged in unfair, unlawful or deceptive practices by failing to keep the Private Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

h) Whether Teladoc violated the federal and state statutes asserted as claims in this Complaint;

i) Whether Plaintiffs and Class Members are entitled to actual, consequential and/or nominal damages as a result of Teladoc's wrongful conduct;

j) Whether Teladoc knowingly made false representations as to their data security and/or privacy policy practices;

k) Whether Teladoc knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

l) Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Teladoc's disclosure of their Private Information.

284. **Typicality.** Plaintiffs' claims are typical of those of other Class members because Plaintiffs' Private Information, like that of every other Class Member, was compromised as a result of Teladoc's incorporation and use of the Pixels, Conversions API and/or other third-party tracking codes.

285. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class, and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

286. **Predominance.** Teladoc has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including the Pixel Information Recipients, in the same way. The common issues arising from Teladoc's conduct affecting Class members set

out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

287. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find that the cost of litigating their individual claim is prohibitively high and would, therefore, have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Teladoc. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

288. **Policies Generally Applicable to the Class.** Teladoc has acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief and corresponding declaratory relief are appropriate on a class-wide basis.

289. **Ascertainability & Notice.** Membership in the Class can be determined by objective records maintained by Teladoc, and adequate notice can be given to Class members directly using information maintained in Teladoc's records.

290. **Class-wide Injunctive Relief.** Unless a Class-wide injunction is issued, Teladoc may continue in its failure to properly secure the Private Information of Class members, Teladoc may continue to refuse to provide proper notification to Class members regarding the practices complained of herein, and Teladoc may continue to act unlawfully as set forth in this Complaint as Teladoc has acted or refused to act on grounds generally applicable to the Class and,

accordingly, final injunctive or corresponding declaratory relief with regard to the Class members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

291. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Teladoc owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing and safeguarding their Private Information and not disclosing it to unauthorized third parties;

b) Whether Teladoc breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using and safeguarding their Private Information;

c) Whether Teladoc failed to comply with their own policies and applicable laws, regulations and industry standards relating to data security;

d) Whether Teladoc adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e) Whether Teladoc failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f) Whether Class members are entitled to actual, consequential and/or nominal damages and/or injunctive relief as a result of Teladoc's wrongful conduct.

## CAUSES OF ACTION

## COUNT I

**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1), *et seq.***
**Unauthorized Interception, Use and Disclosure**
**(*On Behalf of Plaintiffs & the Nationwide Class*)**

292. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

293. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

294. The ECPA protects both sent and received communications.

295. The ECPA, specifically 18 U.S.C. § 2520(a), provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed or intentionally used in violation of Chapter 119.

296. The transmissions of Plaintiffs' and Class Members' Private Information to Teladoc via Teladoc's Website is a "communication" under the ECPA's definition under 18 U.S.C. § 2510(12).

297. The transmission of Private Information between Plaintiffs and Class Members and Teladoc via their Website is "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

298. The ECPA defines "content" when used with respect to electronic communications to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

299. The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

300. The ECPA defines "electronic, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Defendant and Meta use to track Plaintiffs' and Class Members' communications;
b. Plaintiffs' and Class Members' browsers;
c. Plaintiffs' and Class Members' computing devices;
d. Teladoc's web-servers and
e. The Pixels deployed by Teladoc to effectuate the sending and acquisition of users' and patients' sensitive communications.

301. Plaintiffs and Class Members' interactions with Teladoc's Website are electronic communications under the ECPA.

302. By utilizing and embedding the Pixels and Conversions API on their Website and/or servers, Teladoc intentionally intercepted, endeavored to intercept and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

303. Specifically, Teladoc intercepted Plaintiffs' and Class Members' electronic communications via the Pixels and Conversions API, which tracked, stored and unlawfully disclosed Plaintiffs' and Class Members' Private Information to Facebook.

304. Furthermore, Defendant intercepted the "contents" of Plaintiffs' communications in at least the following forms:

a. The parties to the communications;

b. PII such as patients' IP addresses, Facebook IDs, cid parameter cookie, browser fingerprints and other unique identifiers;

c. The precise text of patient communications about specific medical conditions;

d. The precise text of information generated when patients requested or made appointments,

e. The precise text of patient communications about billing and payment;

f. The precise dates and times when patients click to Log-In on Defendant's Website.

305. Teladoc intercepted communications that included, but are not limited to, communications to/from Plaintiffs and Class Members regarding Private Information, including first and last name, email address, IP address, Facebook ID and health information relevant to the screenings and treatment plans in which Plaintiffs and Class Members participated.

306. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools embedded and operating on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Class Members' electronic communications to third parties, including the Pixel Information Recipients, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

307. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools embedded and operating on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs' and Class Members' electronic communications, for purposes other than providing health care services to Plaintiffs and Class Members without authorization or consent, and knowing or having reason

to know that the electronic communications were obtained in violation of the ECPA. *See* 18 U.S.C. § 2511(1)(d).

308. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools it embedded and operated on its Website, contemporaneously and intentionally redirected the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including the Pixel Information Recipients.

309. Teladoc intentionally used wire or electronic communications to increase its profit margins. Teladoc specifically used the Pixels and Conversions API to track and utilize Plaintiffs' and Class Members' Private Information for its own financial benefit.

310. Teladoc was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communications.

311. Plaintiffs and Class Members did not authorize Teladoc to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy via the Pixels and Conversions API.

312. Any purported consent that Teladoc received from Plaintiffs and Class Members was not valid.

313. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State—namely, violations of HIPAA and invasion of privacy, among others.

314. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

315. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding and interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

316. In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Teladoc's Website, creation of accounts, participation in Teladoc's health screenings and/or purchasing a subscription plan, Teladoc's purpose was tortious and designed to violate federal and state law, including as described above, a knowing intrusion into a private place, conversation or matter that would be highly offensive to a reasonable person.

317. Teladoc's acquisition of patient communications that were used and disclosed to Facebook and other third parties was also done for purposes of committing criminal and tortious acts in violation of the laws of the United States and New York, California, Georgia and Florida (as described *infra*). As well as various common law causes of action.

318. Additionally, through the above-described tracking technologies and intercepted communications, this information was, in turn, used by the Pixel Information Recipients to 1) place Plaintiffs in specific health-related categories and 2) target Plaintiffs with particular advertising associated with Plaintiffs' specific health conditions.

319. Here, as alleged above, Defendant violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing IIHI to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) ***relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual***, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[80]

320. Plaintiffs' information that Defendant disclosed to third parties qualifies as IIHI, and Defendant violated Plaintiffs' expectations of privacy and constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d(6). Defendant used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiffs' and Class Members' IIHI, PHI, and Private Information for financial gain.

321. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

322. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization and

b. Disclosed IIHI to Pixel Information Recipients without patient authorization.

[80] § 1320d-(6) (emphasis added).

323. Defendant's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Pixel Information Recipients' source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

324. Consumers have the right to rely upon the promises that companies make to them. Teladoc accomplished its tracking through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that cause Facebook pixels and cookies (including but not limited to the fbp, ga and gid cookies) to be deposited on Plaintiffs' and Class members' computing devices as "first-party" cookies that are not blocked.

325. The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to the Pixel Information Recipients and others.

326. Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to the Pixel Information Recipients.

327. Defendant's scheme or artifice to defraud consists of:

a. the false and misleading statements and omissions in its privacy policy set forth above, including the statements and omissions recited in the claims below and

b. the placement of the 'fbp' cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Meta.

328. As such, Defendants cannot viably claim any exception to ECPA liability.

329. As a direct and proximate result of Teladoc's violation of the ECPA, Plaintiffs and Class Members were damaged by Teladoc's conduct.

330. As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of

whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## **COUNT II**

## **NEGLIGENCE**
**(*On Behalf of Plaintiffs & the Nationwide Class*)**

331. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

332. Upon accepting, storing and controlling the Private Information of Plaintiffs and the Class, Teladoc owed—and continues to owe—a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive Private Information.

333. Teladoc breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

334. It was reasonably foreseeable that Teladoc's failures to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information through their use of the Pixels, Conversions API and other tracking technologies would result in unauthorized third parties—such as the Pixel Information Recipients—gaining unlawful access to such Private Information.

335. Teladoc's duty of care to use reasonable measures to secure and safeguard Plaintiffs' and Class Members' Private Information arose due to the special relationship that existed between Teladoc and its patients, which is recognized by statute, regulations and the common law.

336. In addition, Teladoc had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such information can be used and to whom it can be disclosed. HIPAA

privacy laws not only apply to healthcare providers and the organizations they work for but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

337. Teladoc's own conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their Private Information. Teladoc's misconduct included the failure to (1) secure Plaintiffs' and Class Members' Private Information; (2) comply with industry-standard data security practices; (3) implement adequate Website and event monitoring and (4) implement the systems, policies and procedures necessary to prevent unauthorized disclosures resulting from the use of the Pixels, Conversions API and other tracking technologies.

338. As a direct result of Teladoc's breach of their duty of confidentiality and privacy and the disclosure of Plaintiffs' and Class Members' Private Information, Plaintiffs and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

339. Teladoc's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiffs' and Class Members' Private Information constituted (and continues to constitute) negligence at common law.

340. Plaintiffs and the Class are entitled to recover damages in an amount to be determined at trial.

## COUNT III

### BREACH OF IMPLIED CONTRACT
**(*On Behalf of Plaintiffs & the Nationwide Class*)**

341. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

342. As a condition of utilizing Defendant's Website and receiving services from Defendant's professionals, Plaintiffs and the Class Members provided their Private Information and compensation for their medical care.

343. When Plaintiffs and Class Members provided their data to Teladoc in exchange for services, they entered into an implied contract pursuant to which Teladoc agreed to safeguard and not disclose their Private Information without consent.

344. Plaintiffs and Class Members accepted Teladoc's offers and provided their Private Information to Teladoc.

345. By providing their Private Information and upon Defendant's acceptance of this information, Plaintiffs and the Class members (as one set of parties) and Defendant (as the other party) entered into implied-in-fact contracts to keep the provided information private and confidential.

346. This obligation was described in the terms that Defendant itself represented on its own Notice of Privacy Practices, which Defendant itself required Plaintiffs and Class members assent to prior to proceeding with registration. Therefore, Defendant expressly assented to this obligation in these implied contracts.

347. Plaintiffs and Class Members would not have entrusted Teladoc with their Private Information in the absence of an implied contract between them and Teladoc obligating them not to disclose this Private Information without consent.

348. Defendant breached its obligations in the implied contracts by intercepting (or facilitating the interception of), disclosing and sharing with third parties the Private Information belonging to Plaintiffs and Class members without their consent.

349. As a direct and proximate result of Teladoc's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Teladoc's services or would have paid substantially for these services, had they known their Private Information would be disclosed.

350. Plaintiffs and Class Members are entitled to compensatory and consequential damages because of Teladoc's breach of implied contract.

## COUNT IV

### BREACH OF CONFIDENCE
### (*On Behalf of Plaintiffs & the Nationwide Class*)

351. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

352. Possessors of non-public medical information, such as Teladoc, have a duty to keep such medical information completely confidential.

353. Plaintiffs and Class Members had reasonable expectations of privacy in the responses and communications entrusted to Teladoc through their Website, which included highly sensitive Private Information.

354. Contrary to their duties as telehealth institutions and their express promises of confidentiality, Teladoc installed the Pixels and Conversions API to disclose and transmit to third parties Plaintiffs' and Class Members' Private Information, including data relating to Plaintiffs' and Class Members' health.

355. These disclosures were made without Plaintiffs' or Class members' knowledge, consent or authorization.

356. The third-party recipients included, but may not be limited to, the Pixel Information Recipients.

357. As a direct and proximate cause of Teladoc's unauthorized disclosures of Plaintiffs' and Class Members' Private Information, Plaintiffs and Class Members were damaged by Teladoc's breach of confidentiality in that (a) sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private; (b) Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; (c) Teladoc eroded the essential confidential nature of health services that Plaintiffs and Class Members participated in; (d) general damages for invasion of their rights in an amount to be determined by a jury at trial; (e) nominal damages for each independent violation; (f) the unauthorized use of something of value (the highly sensitive Private Information) that belonged to Plaintiffs and Class Members and the obtaining of a benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation to Plaintiff or Class members for the unauthorized use of such data; (g) diminishment of the value of Plaintiffs' and Class Members' Private Information; and (h) violation of property rights Plaintiffs and Class Members have in their Private Information.

## COUNT V

### CONSTRUCTIVE BAILMENT
**(*On Behalf of Plaintiffs & the Nationwide Class*)**

358. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

359. Teladoc acquired and was obligated to safeguard the Private Information of Plaintiffs and Class Members.

360. Teladoc accepted possession and took control of Plaintiffs' and Class Members' Private Information under such circumstances that the law imposes an obligation to safeguard the property of another.

361. Specifically, a constructive bailment arises when Teladoc, as is the case here, takes lawful possession of the property of another and has a duty to account for that property, without intending to appropriate it.

362. Constructive bailments do not require an express assumption of duties and may arise from the bare fact of the thing coming into the actual possession and control of a person fortuitously or by mistake as to the duty or ability of the recipient to affect the purpose contemplated by the absolute owner.

363. During the bailment, Teladoc owed a duty to Plaintiffs and Class Members to exercise reasonable care, diligence and prudence in protecting their Private Information.

364. Teladoc breached its duty under the constructive bailment by failing to take appropriate measures to safeguard and protect Plaintiffs' and Class Members' Private Information, resulting in the unlawful and unauthorized access to, disclosure and misuse of such Information by third parties such as Facebook.

365. Teladoc further breached its duty to safeguard Plaintiffs' and Class Members' Private Information by failing to notify them individually in a timely and accurate manner that their Private Information had been disclosed to third parties without Plaintiffs' and Class Members' knowledge, consent or explicit authorization.

366. As a direct and proximate result of Teladoc's breach of its constructive bailment, Plaintiffs and Class Members have suffered compensable damages that were reasonably foreseeable to Teladoc, including but not limited to, the damages set forth herein.

## COUNT VI

### UNJUST ENRICHMENT
**(*On Behalf of Plaintiffs & the Nationwide Class*)**

367. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

368. Plaintiffs bring this claim in the alternative to their common law causes of action.

369. By intercepting (or facilitating the interception of), disclosing and sharing with third-parties the Private Information belonging to Plaintiffs and Class members without their consent, Defendant benefitted (and/or was enriched) through, *inter alia*, receiving revenues from this conduct from parties that received and used this info such as Meta/Facebook.

370. Plaintiffs and Class Members conferred a benefit upon Teladoc in the form of the monetizable Private Information that Teladoc collected from them and disclosed to third parties, including the Pixel Information Recipients, without authorization and proper compensation.

371. Teladoc consciously collected and used this information for their own gain, providing Teladoc with economic, intangible and other benefits, including substantial monetary compensation.

372. Teladoc unjustly retained those benefits at the expense of Plaintiffs and Class Members because Teladoc's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs or Class members.

373. This benefit was received at the expense of Plaintiffs and Class members since their Private Information has diminished in value because of this disclosure.

374. The benefits that Teladoc derived from Plaintiffs and Class Members were not offered by Plaintiffs or Class members gratuitously and, thus, rightly belongs to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in New York and every other state for Teladoc to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

375. As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

376. Teladoc should be compelled to disgorge into a common fund for the benefit of Plaintiffs and the Class all unlawful or inequitable proceeds that Teladoc received, and such other relief as the Court may deem just and proper.

## COUNT VII

### VIOLATION OF THE NEW YORK DECEPTIVE TRADE PRACTICES ACT
**New York Gen. Bus. Law § 349, *et seq.***
***(On Behalf of Plaintiff Durso & the New York Subclass)***

377. Plaintiff Durso re-alleges and incorporates by reference the allegations above as if fully set forth herein.

378. New York General Business Law § 349 broadly prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state.

379. Defendant engaged in (and continues to engage in) a deceptive (and/or prohibited) practice under Section 349 by intercepting (or facilitating the interception of), disclosing, and

sharing with third parties the Private Information belonging to Plaintiffs and Class members without their consent in direct contravention of affirmative representations it made on its public Notice of Privacy Practices and against various laws and public policy.

380. Defendant's actions as set forth above were consumer-oriented conduct occurred in the conduct of trade or commerce. Defendant published the Notice of Privacy Policy publicly on its Website. The Privacy Policy advises that Defendant will keep consumers' information and communications confidential and explain the extent of any disclosures.

381. The Privacy Policy was posted on the Website, the same location where consumers, including Plaintiffs and Class members, provide Defendant with their Private Information. As such, Defendant's representations in the Privacy Policy are directed at consumers.

382. Defendant's conduct renders its Notice of Privacy Practices deceptive and the representations contained therein regarding the confidentiality of user data false and misleading.

383. By the acts and conduct alleged herein, Teladoc committed unfair or deceptive acts and practices by:

a. promising to maintain the privacy and security of Plaintiffs' and Class Members' Private Information as required by law;

b. installing the Meta Pixel to operate as intended and transmit Plaintiffs' and Class Members' Private Information without their authorization to Facebook;

c. failing to disclose or omitting material facts to Plaintiffs and Class Members regarding the disclosure of their Private Information to Facebook;

d. failing to take proper action to ensure the Pixel was configured to prevent unlawful disclosure of Plaintiffs' and Class Members' Private Information;

e. unlawfully disclosing Plaintiffs' and Class Members' Private Information to Facebook.

384. These unfair acts and practices violated duties imposed by laws, including but not limited to, the Federal Trade Commission Act, HIPAA and NY GBL § 349.

385. Teladoc's actions also constitute deceptive and unfair acts or practices because Teladoc knew it failed to disclose to Plaintiff Durso and the New York Class Members that their healthcare-related communications via the Website would be disclosed to Facebook.

386. Teladoc's actions also constitute deceptive and unfair acts or practices because Teladoc intended that Plaintiff Durso and the New York Class Members rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Teladoc's offering of goods and services.

387. Specifically, Teladoc was aware that Plaintiff Durso and the New York Class Members depended on and relied upon it to keep their communications confidential, and Teladoc instead disclosed that information to Facebook.

388. In addition, Teladoc's material failure to disclose that Teladoc collects Plaintiff Durso's and the New York Class Members' Private Information for marketing purposes with Facebook constitutes an unfair act or practice prohibited by the NY GBL § 349. Teladoc's actions were immoral, unethical and unscrupulous.

389. The facts Defendant misrepresented and concealed or failed to disclose, to Plaintiffs and the Class are material in that a reasonable consumer would have considered them important in deciding whether to provide their Private Information to Defendant. This deception was material as the promise of confidentiality of data was a key factor in a reasonable consumer's decision to utilize Defendant's services. And, as reasonable consumers, had Plaintiffs and Class members known that Defendant would not abide by the terms of its own privacy policies, and share their

sensitive Private Information with third parties, they would not have signed up for Defendant's services.

390. Plaintiff Durso and the New York Class had reasonable expectations of privacy in their communications exchanged with Teladoc, including communications exchanged on its Website.

391. Contrary to its duties as a medical provider and its express promises of confidentiality, Teladoc deployed the Pixel to disclose and transmit Plaintiffs' personally identifiable, non-public medical information and the contents of her communications exchanged with Teladoc to third parties like Facebook.

392. Teladoc's disclosures of Plaintiff Durso's and the New York Class Members' Private Information were made without their knowledge, consent or authorization, and were unprivileged.

393. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

394. Teladoc willfully, knowingly, intentionally and voluntarily engaged in the aforementioned acts when it incorporated the Meta Pixel with knowledge of the Pixel's purpose and functionality.

395. The harm described herein could not have been avoided by Plaintiff Durso and the New York Class Members through the exercise of ordinary diligence.

396. As a result of Teladoc's wrongful conduct, Plaintiff Durso was injured in that she never would have provided her Private Information to Teladoc or purchased Teladoc's services, had she known or been told that Teladoc shared confidential and sensitive Private Information with Facebook.

397. As a direct and proximate result of Teladoc's multiple, separate violations of the NY GBL § 349, Plaintiff Durso and the New York Class Members have suffered harm, including financial losses related to the payments or services made to Teladoc that Plaintiff Durso and the New York Class Members would not have made had they known of Teladoc's disclosure of their Private Information to Facebook, lost control over the value of their Private Information, and other harm resulting from the unauthorized use or threat of unauthorized use of their Private Information, including for unwanted solicitations or marketing, entitling them to damages in an amount to be proven at trial.

398. Teladoc's acts, practices and omissions were done in the course of Teladoc's business of furnishing healthcare-related services to consumers in the State of New York.

399. Plaintiff Durso brings this action on behalf of herself and the New York Class Members for the relief requested and for the public benefit to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class members and the public from Teladoc's unfair, deceptive and unlawful practices. Teladoc's wrongful conduct has had a widespread impact on the public at large.

400. As a result, Plaintiff Durso and the New York Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorney's fees incurred in this action.

## COUNT VIII

### VIOLATION OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT
### Fla. Stat. §§ 934.01, *et seq*.
### (*On Behalf of Plaintiff Pattison & the Florida Subclass*)

401. Plaintiff Pattison re-alleges and incorporates by reference the allegations above as if fully set forth herein.

402. Where there is a reasonable expectation of privacy, absent the consent of all parties, the FSCA prohibits, among other things, the intentional interception or procurement of another person to intercept any wire, oral or electronic communication. Fla. Stat. §§ 934.03(1), 934.03(2)(d).

403. Any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, a wire, electronic or oral communication in violation of the FSCA is subject to a civil action for, among other things: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs reasonably incurred. Fla. Stat. § 934.10.

404. Under the FSCA, "wire communication" means "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception including the use of such connection in a switching station furnished or operated by any person engaged in providing or operating such facilities for the transmission of intrastate, interstate, or foreign communications or communications affecting intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(1).

405. Under the FSCA, "intercept" is defined as the "[a]ural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

406. Under the FSCA, "contents" in the context of "any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7).

407. Under the FSCA, “person” is defined in relevant part as, “any individual, partnership, association, joint stock company, trust, or corporation.” Fla. Stat. § 934.02(5).

408. With some exclusions that do not impact the Florida Plaintiffs’ claims, under the FSCA, “electronic communication” is defined as “[a]ny transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system that affects intrastate, interstate, or foreign commerce . . .” Fla. Stat. 934.02(12).

409. The FSCA prohibits: (1) the interception or procurement of another to intercept any wire, oral or electronic communication; (2) the intentional disclosure of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication; and (3) the intentional use of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication. Fla. Stat. 934.03(1).

410. Any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, a wire, oral or electronic communication in violation of the FSCA is subject to a civil action for: (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys’ fees and other litigation costs incurred. Fla. Stat. 934.10.

411. At all relevant times, Teladoc procured Facebook to contemporaneously track and intercept Plaintiff Pattison’s and the Florida Class Members’ internet communications—communications include communications with doctors, receipt of diagnosis, treatment or management of medical conditions—while navigating the Website.

412. Teladoc procured Facebook to contemporaneously intercept these communications without authorization and consent from Plaintiff Pattison and the Florida Class Members.

413. Teladoc, when procuring Facebook to intercept Plaintiff Pattison's and the Florida Class Members' communications, intended Facebook to contemporaneously learn the meaning of the content of Plaintiff Pattison's and the Florida Class Members' communications with Teladoc.

414. Plaintiff Pattison and the Florida Class Members had a justified and reasonable expectation under the circumstances that their electronic communications would not be intercepted.

415. Plaintiff Pattison and the Florida Class Members were not aware that their electronic communications were being intercepted by Facebook and did not consent to the interception.

416. In connection with procuring Facebook's contemporaneous interception of Plaintiff Pattison's and the Florida Class Members' communications with Teladoc, Teladoc embedded the Meta Pixel on the Website.

417. The Meta Pixel constitutes an electronic or other device through which the contents of a wire, oral and electronic communication can be acquired, including the contents of Plaintiff Pattison's and the Florida Class Members' communications with Teladoc via the Website.

418. Teladoc's disclosures of Plaintiffs' and the Florida Class Members' Private Information were made without their knowledge, consent or authorization, and were unprivileged.

419. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

420. Teladoc willfully, knowingly, intentionally and voluntarily engaged in the aforementioned acts when they incorporated the Meta Pixel on their Website, with knowledge of

the Pixel's purpose and functionality, and further utilized the benefits that Pixel provides website owners to the detriment of Plaintiff Pattison and the Florida Class Members.

421. Plaintiff Pattison and the Florida Class Members could not have avoided the harms described herein through the exercise of ordinary diligence.

422. As a result of Teladoc's actions, Plaintiff Pattison and the Florida Class Members have suffered harm and injury.

423. Teladoc's unlawful conduct is ongoing. Thus, injunctive and declaratory relief is necessary and appropriate to prevent further violations.

424. Plaintiff Pattison and the Florida Class Members have been damaged as a direct and proximate result of Teladoc's invasion of their privacy and are entitled to just compensation, including monetary damages.

425. Plaintiff Pattison and the Florida Class Members seek appropriate relief for these injuries, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests because of Teladoc's violation of the FSCA.

426. Plaintiff Pattison and the Florida Class Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

## COUNT IX

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 630, *et seq*.
### (*On Behalf of Plaintiffs Charter, Tuomala, Hale, Ahmed & the California Class Members*)

427. Plaintiffs Charter, Tuomala, Hale and Ahmed (the "California Plaintiffs") re-allege and incorporates by reference the allegations above as if fully set forth herein.

428. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose.

> The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

429. California Penal Code § 631(a) provides, in pertinent part (emphasis added):

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

430. Under CIPA, Teladoc must show it had the consent of all parties to a communication.

431. At all relevant times, Teladoc aided, employed, agreed with and conspired with Facebook and other unauthorized third parties to track and intercept the California Plaintiffs' and the California Subclass Members' internet communications via Teladoc's Website.

432. These communications were transmitted to and intercepted by an unauthorized third party during the communication and without the knowledge, authorization or consent of the California Plaintiffs and the California Subclass Members.

433. Teladoc intentionally inserted an electronic listening device onto the California Plaintiffs' and California Subclass Members' web browsers that, without the knowledge and

consent of the California Plaintiffs and California Subclass Members, tracked and transmitted the substance of their confidential communications with Teladoc to a third party.

434. Importantly, the Private Information Facebook and other unauthorized third parties intercepted constitutes "contents" within the meaning of the statute, not merely meta-data, because Facebook received the exact phrases that patients communicated via the Website.

435. As explained elsewhere, the California Plaintiffs' and California Subclass Members' specific medical conditions and other confidential details were intercepted, and they were not redacted or anonymized prior to the interceptions.

436. Teladoc willingly facilitated Facebook's interception and collection of the California Plaintiffs' and California Subclass Members' private medical information by embedding the Facebook Pixel, Facebook Business Tools and other tracking tools on its Website.

437. Moreover, unlike past Facebook business tools such as the Facebook Like Button and older web beacons, Teladoc has full control over the Pixel, including which webpages contain the pixel, what information is tracked and transmitted via the Pixel and how events are categorized prior to their transmission.

438. Teladoc's pixel and tracking tools constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, these tools fall under the broad catch-all category of "any other manner."

439. Teladoc failed to disclose its use of the Facebook Pixel, Google Analytics or other tracking technologies to specifically track and automatically and simultaneously transmit the California Plaintiffs' and California Subclass Members' communications with Teladoc to undisclosed third parties.

440. The Pixel is designed such that it transmits each of the Users' actions taken on the Website to a third party alongside and contemporaneously with the User initiating the communication. Thus, the communication is intercepted in transit to the intended recipient, Teladoc, before it reaches Teladoc's server.

441. As a result of the above violations and pursuant to CIPA Section 637.2, Teladoc is liable to the California Plaintiffs and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiffs have suffered, or be threatened with, actual damages."

442. Under the statute, Teladoc is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Teladoc in the future,

## COUNT X

### VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT
### Cal. Civ. Code § 56, *et seq.*
### (*On Behalf of the California Plaintiffs & the California Class Members*)

443. The California Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

444. The California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et seq.* ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without a patient's authorization.

445. Medical information refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care… regarding

a patient’s medical history, mental or physical condition, or treatment.” 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual...” Cal. Civ. Code § 56.05(j).

446. Teladoc is a healthcare provider as defined by Cal. Civ. Code § 56.06.

447. The California Plaintiffs and California Subclass Members are patients of Teladoc and, as a health care provider, Teladoc has an ongoing obligation to comply with the CMIA’s requirements with respect to Plaintiffs’ and California Subclass Members’ confidential medical information.

448. As set forth above, Teladoc disclosed its patients’ medical information—such as medical conditions, symptom information, details regarding their treating physician, sought treatments, search queries, information regarding upcoming appointments and more—via the Website, and that information was individually identifiable because it was intercepted and/or transmitted alongside the specific patients’ name, contact information, device identifiers, IP addresses, Facebook IDs and other persistent and unique characteristics unauthorized third parties use to identify specific individuals.

449. The Facebook ID is one example of an identifier that reveals a specific patient’s identity.

450. Pursuant to the CMIA, the information communicated to Teladoc and disclosed to Facebook constitutes medical information because it is patient information derived from a health care provider regarding patients' medical treatment and physical condition and is received by Facebook in combination with individually identifying information. Cal. Civ. Code § 56.05(j).

451. As set forth above, Facebook views, processes and analyzes the confidential medical information it receives via the Facebook Tracking Pixel, Conversions API and other

Facebook business tools. Facebook then uses the viewed confidential information to create Audiences for advertising and marketing purposes.

452. Teladoc failed to obtain the California Plaintiffs' and California Subclass Members' authorization for the disclosure of medical information.

453. Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must: (1) be "clearly separate from any other language present on the same page and … executed by a signature which serves no other purpose than to execute the authorization;" (2) be signed and dated by the patient or their representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Any information set forth on Teladoc's Website, including the Website Privacy Policy and Notice of Privacy Practices, does not qualify as a valid disclosure or authorization.

454. Teladoc violated the CMIA by disclosing its patients' medical information to Facebook along with the patients' individually identifying information.

455. The California Plaintiffs and California Subclass Members seek statutory damages, nominal damages, compensatory damages, punitive damages, attorneys' fees and costs of litigation for Teladoc's CMIA violations.

## COUNT XI

### VIOLATION OF THE UNFAIR COMPETITION LAW
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(*On Behalf of the California Plaintiffs & the California Class Members*)**

456. The California Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

457. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

458. Teladoc engaged in unlawful business practices in connection with its disclosure of the California Plaintiffs' and California Subclass Members' Private Information to unrelated third parties, including Facebook, in violation of the UCL.

459. The acts, omissions and conduct of Teladoc as alleged therein constitute "business practices" within the meaning of the UCL.

460. Teladoc violated the "unlawful" prong of the UCL by violating Plaintiffs' and California Subclass Members' constitutional rights to privacy, state and federal privacy statutes including CIPA, CMIA, HIPAA and Section 5 of the FTC Act, and state consumer protection statutes.

461. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Teladoc of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Teladoc's duty. Teladoc violated Section 5 of the FTC Act and similar state statutes by failing to use reasonable measures to maintain Private Information as confidential and by not complying with regulations and industry standards.

462. The harm caused by Teladoc's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Teladoc's legitimate business interests other than Teladoc's conduct described therein.

463. As a result of Teladoc's violations of the UCL, the California Plaintiffs and California Subclass Members are entitled to injunctive relief. This is particularly true since the

dissemination of the California Plaintiffs' and California Subclass Members' information is ongoing.

464. As result of Teladoc's violations of the UCL, the California Plaintiffs and California Subclass Members have suffered injury in fact and lost money or property, including but not limited to payments to Teladoc for services and/or other valuable consideration and access to their private and personal data. The California Plaintiffs and California Subclass Members would not have used Teladoc's services had they known Teladoc was breaching confidentiality and disclosing their Private Information to third parties such as Facebook.

465. The unauthorized access to the California Plaintiffs' and California Subclass Members' private and personal data also has diminished the value of that information.

466. Additionally, Plaintiffs' and Class Members' Private Information is a form of property. Teladoc's unauthorized and unlawful dissemination of Plaintiffs' and Class Members' Private Information interfered with their rights over the property, including their rights to control their property and exclude others from accessing the property, both in the present and in the future.

467. In the alternative to those claims seeking remedies at law, the California Plaintiffs and California Subclass Members allege that there is no plain, adequate and complete remedy that exists at law to address Teladoc's unlawful and unfair business practices. Further, no private legal remedy exists under HIPAA. Therefore, the California Plaintiffs and members of the proposed California Subclass are entitled to equitable relief to restore them to position they would have been in had Teladoc not engaged in unfair competition, including an order enjoining Teladoc's wrongful conduct, restitution and disgorgement of all profits paid to Teladoc because of its unlawful and unfair practices. Further, restitution and disgorgement may result in a greater award for Plaintiffs and Class Members than they would be able to obtain from an award of damages, in addition to

the fact that damages resulting from Teladoc's conduct are less certain than the determination of Teladoc's improper gains from Plaintiffs' and Class Members' Private Information.

## COUNT XII

### VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
### Cal. Civ. Code § 1750, *et seq.*
### (*On Behalf of the California Plaintiffs & the California Class Members*)

468. The California Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

469. Plaintiffs and Class members are "consumers" as that term is defined by Cal. Civ. Code § 1761, as they sought and acquired services from Teladoc for personal, family, our household purposes.

470. Teladoc provides "services" as the term is defined by Cal. Civ. Code § 1761.

471. Teladoc engaged in "unfair methods of competition and unfair or deceptive acts . . . in a transaction . . . that result[ed] . . . in the sale . . . of goods or services" to Plaintiffs and Class Members in violation of Cal. Civ. Code § 1750 and Cal. Civ. Code § 1770(a)(5), (7), (9), (14), (16).

472. For instance, Teladoc made representations that it would protect the California Plaintiffs' and the California Subclass Members' privacy interest, including promising that it will keep Private Information private and secure, that Teladoc does not sell Users' Private Information and that it will only disclose Private Information under certain circumstances, none of which was true.

473. Teladoc made these representations with no intention of living up to these representations. Contrary to these representations, Teladoc disclosed and allowed third parties to intercept its Users' Private Information.

474. Further, Teladoc failed to disclose it secretly shared, used and allowed third parties to intercept the California Plaintiffs' and California Subclass Members' Private Information.

475. Teladoc was under a duty to disclose this information given Teladoc's relationship with its Users and Defendant's exclusive knowledge of its misconduct (the tracking technology incorporated on Defendant's Website, the fact that Private Information is disclosed to unauthorized third parties, that Defendant allowed third parties to intercept Private Information through this technology and how Defendant and third parties used this data).

476. The California Plaintiffs and California Subclass Members would not have purchased or would have paid significantly less for Teladoc's medical services had Teladoc not made these false representations. Teladoc profited directly from these sales, including through payment for these services and from the Private Information disclosed and intercepted.

477. The California Plaintiffs, individually and on behalf of the California Subclass Members, seek an injunction requiring Teladoc to obtain consent prior to disclosing and otherwise using the California Plaintiffs' and California Subclass Members' Private Information and to delete the Private Information already collected, and any other relief which the court deems proper.

478. Pursuant to Cal. Civ. Code § 1782(a), the California Plaintiffs served Teladoc with notice of its alleged violations of the CLRA by certified mail return receipt requested contemporaneously with the filing of this complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Adeline Pattison, Dominique Durso, Jean Charter, Liane Tuomala, Michelle Grenon, Teresa Hale, Zeshaan Ahmed, and Myschelle Taylor, on behalf of themselves and the proposed Classes, respectfully request that this Court enter an Order in their favor and against Teladoc as follows:

a) Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as representatives of the Classes, and appointing their counsel to represent the Classes;

b) For equitable relief enjoining Teladoc from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or unauthorized disclosure of Plaintiffs' and Class Members' Private Information;

c) For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

d) For an award of damages, including but not limited to, actual, consequential, punitive and nominal damages, as allowed by law in an amount to be determined;

e) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

f) Pre- and post-judgment interest on any amounts awarded; and

g) Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

Date: July 2, 2024

Respectfully submitted,

*s/: David S. Almeida*
David S. Almeida
New York Bar No. 3056520
Elena A. Belov
New York Bar No. 4080891
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
T: (312) 576-3024
E: david@almeidalawgroup.com
E: elena@almeidalawgroup.com

Daniel O. Herrera*
Nickolas J. Hagman*
Alex Lee*
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com
alee@caffertyclobes.com

**Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs & the Proposed Classes*